112    291
135    ²545

112    291
153    ¹296

## PEOPLE *v.* PARMELEE.

1. HOMICIDE—CORPUS DELICTI—EVIDENCE.

> On a trial for murder, it appeared that the body of the deceased, a young unmarried woman, was found in the woods; that a bottle of laudanum was discovered near at hand, but there was no trace of poison in the stomach. There was evidence to show that, about the time she entered the woods, respondent was seen to enter from the opposite side; that a cry was heard shortly afterwards; that marks were discovered upon the face and throat of the deceased, and the ground was indented and limbs broken under her head; that hair was found upon the ground, which matched the respondent's; and that the vial containing the poison had been seen in respondent's house. Two physicians, who made a *post mortem* examination, testified that ruptured blood vessels were found in the throat, that the wind pipe was crushed, the lungs collapsed, the membranes of the brain congested, and that the nose was pressed to one side; that the symptoms were those of strangulation, and that the injuries could not have been inflicted by the deceased herself. *Held,* that there was ample proof of the *corpus delicti.*

2. SAME—MOTIVE FOR CRIME.

In a prosecution for the murder of an unmarried woman, the fact that the deceased was a witness for respondent in divorce proceedings may be shown as bearing upon the relations which existed between them, and as tending to support the claim that respondent was the author of the pregnancy of the deceased, and that this furnished the motive for the crime.

3. TRIAL—REMARKS OF COUNSEL.

A conviction will not be reversed because of the improper remarks of the prosecuting officer in his argument to the jury, where they were provoked by the intemperate language of respondent's attorney, and the jury were instructed that all such remarks should be disregarded.

Error to Grand Traverse; Corbett, J. Submitted February 4, 1897. Decided April 6, 1897.

Woodruff Parmelee was convicted of murder in the first degree. Affirmed.

The respondent was convicted of the murder of one Julia Curtis, an unmarried woman, aged 22 years. Her father was a farmer, and she lived at home. She was rather slender, weighing about 100 pounds. The respondent was also a farmer, living about a mile north of the Curtis home, twice married, and twice divorced. About 1 o'clock in the afternoon of April 29, 1895, Miss Curtis, with a small basket and shovel, left her father's house, and went into the woods near by, with the supposed purpose of gathering flowers. She did not return, and her parents, becoming alarmed early in the evening, with some of the neighbors, instituted a search. On the next morning, the entire neighborhood was aroused, and instituted a systematic search through the woods, resulting in finding the dead body of the girl in some thick bushes, with her head lying towards a log, and her body nearly at right angles with it. She lay upon her back, with her right hand by her side, her left hand upon her breast, and her handkerchief between the thumb and finger of the left hand. One foot was crossed over the

other, and her clothes were orderly arranged about the
body and feet.   Her hat lay near her upon the ground.
In the basket near by was found a small square vial,
about half filled with fluid, which proved to be laudanum.
There were no visible signs of a struggle.   Marks were
discovered upon her face and throat, which became more
distinct on the second day.   A *post mortem* examination
was held.   Clots of blood and ruptured blood vessels
were found in the throat, near Adam's apple.   The tri-
coid cartilage or upper ring of the wind pipe was crushed
in, nearly to the center.   The lungs were collapsed, the
lower and back part being filled with blood.   The mem-
branes covering the brain were highly congested and
bloody.   The nose was pressed to one side.   The *post
mortem* examination further disclosed that she had been
pregnant for about two months.   Her underclothing was
not disturbed.

The theory of the prosecution was that the respondent
was the author of her shame; that, by agreement, the two
met in the woods upon the day in question; and that he
committed the murder.   One of the theories, and perhaps
the principal one, urged on behalf of the respondent, was
that she committed suicide.   The prosecution contended,
and gave evidence to support the contention, that the
respondent, about the same hour that the girl entered the
woods from one side, entered it from the other; that he
strangled the girl with his right hand, the thumb pressing
in the throat; that, with the other hand over the mouth
and nose, he stopped her cries; and that his right knee
upon the abdomen caused the discoloration there found.
The prosecution gave evidence tending to show that a vial
of the same size and shape was seen in the respondent's
house shortly before the disappearance of the girl; that it
contained laudanum, was about half full; that no such
vial of laudanum was ever seen in the house of Mr. Curtis
or in the possession of the deceased; that the vial had no
label, neither had the one seen in the respondent's house.

A man by the name of Merrill had been at work for two

or three weeks in the vicinity, and had boarded at the house of Mr. Curtis. This man left a few days after the disappearance of the girl.

This is a sufficient statement of the facts to show the issues presented for the determination of the jury. Further facts, so far as necessary, will be referred to in determining the questions raised.

*Watson & Chapman* and *Turner & Gates*, for appellant.

*Fred A. Maynard*, Attorney General, and *W. H. Foster*, Prosecuting Attorney, for the people.

GRANT, J. (*after stating the facts*). 1. The first and principal point discussed by the respondent's counsel is that there was no proof of the *corpus delicti.* Two physicians, in behalf of the prosecution, made the *post mortem* examination, and testified that, in their opinion, the girl died suddenly, from strangulation, caused by pressure upon the throat, and that this injury could not have been inflicted by herself. These physicians testified that they had never had a case of strangulation before. They also testified that some of the symptoms resulting from strangulation would be the same as those resulting from death from poison by laudanum. The contents of the stomach were sent to an expert chemist at the University of Michigan for analysis, and he testified that no poison was found in the contents. He also testified that the poison might be found in the urine, brain, liver, and kidneys. No examination was made of these to determine whether they contained any poison. There might be some force in the contention in behalf of the respondent if there were no other evidence except the absence of poison in the stomach. But, in addition to the marks of violence upon the body, there is also evidence that a cry was heard in the woods while she was there; that there was an indentation in the ground under her head; that limbs were broken which were on the ground underneath the head,

and that it required hard pressure to break them; that some hairs were found upon the twig of a bush near the head of the body, which were claimed to be those of the girl, and also a hair upon the ground, which was claimed to be that of the respondent. These were introduced in evidence. There was also evidence to show that she and the respondent were together on the day before and in the forenoon of the day of the alleged murder. In view of the testimony of the physicians as to the cause of death, the marks of force upon the body, and other circumstances, we think there was ample proof of the *corpus delicti*, and this point was properly left to the jury.

2. The theory that Mr. Merrill was the perpetrator of the crime is without any foundation. He was at work in a field adjoining the woods, and another man, who was a witness, was working near by. He had known the girl but two or three weeks, and there is no evidence of any intimacy between them. Nor is there any evidence to indicate that he was in the woods on the afternoon in question. There is nothing upon the record to indicate that any duty rested upon the prosecution to attempt to find Merrill, or produce him as a witness. He left on the Saturday following the murder, and went to Saginaw. Neither party seemed to consider it of any importance to find him.

3. Error is assigned upon the alleged introduction of testimony given by the respondent before the coroner at the inquest. The respondent was subpœnaed as a witness, and testified at the inquest. His counsel do not, in their brief, cite either the testimony, or the place in the record where the testimony was introduced. The deposition of the respondent given upon that occasion was offered by the prosecution, and, after hearing argument, the court excluded it. The record in this case is very long, covering over 700 pages of typewritten matter. Counsel should point out the page in the record where such questions are raised. When the deposition was offered, the court stated that the witness had testified

without objection to what respondent testified to upon the coroner's inquest, and it did not see why it was necessary to urge the introduction of the deposition. The deposition, however, was excluded, all the oral testimony on this point stricken from the case, and the jury instructed to disregard it entirely. The question, therefore, of its admissibility, is not before us for adjudication. Furthermore, there is nothing in the brief of counsel to show what, if anything, there was in this testimony that was damaging to the respondent.

4. The respondent was a witness in his own behalf, and, on cross-examination, testified, under objection and exception, that he had been twice divorced, and that Miss Curtis was a witness for him in the last divorce suit. He also testified that his second wife obtained a decree from him on the ground of cruelty. The claim on the part of the prosecution was that respondent was the author of the girl's shame. It was entirely competent to show the relations that existed between them; and the fact, together with others, that she was a witness for him in his divorce suit, was competent to show their relations. He was a witness in his own behalf, and subject to the same rules of cross-examination as any other witness. A thorough examination into his past life was competent, and we do not think that the examination exceeded legitimate bounds. If, however, the testimony in regard to his having been divorced were improper, it is not such an error as would justify the reversal of the case.

5. Complaint is made that the prosecuting attorney, during the progress of the trial, in his argument to the jury, used improper language, calculated to prejudice the respondent in the minds of the jury. The entire argument of the prosecuting attorney is in the record, while the argument on behalf of the respondent is not. It is, however, manifest, that the argument now complained of was in reply to the argument on behalf of the respondent. It appears that one of the attorneys for the respondent charged the prosecuting officer with being "a

persecutor instead of a prosecutor," and that he called the people of Traverse City, where the case was being tried, "a mob thirsting for the blood of Woodruff Parmelee." In view of the character of the argument on behalf of the respondent, we find nothing in the argument of the prosecuting attorney to justify a reversal of the case. Upon this point, the judge, at the conclusion of the trial, with emphasis, instructed the jury that they must not consider these intemperate remarks made by counsel upon either side. The desire on the part of the circuit judge to deal fairly in his rulings with the respondent, and to properly protect his rights, is very marked, and he was especially fortunate in so doing.

We think the respondent had a fair and impartial trial, and the conviction is affirmed.

The other Justices concurred.