PEOPLE *v.* KIRBY.

HOMICIDE—PROOF OF CORPUS DELICTI NECESSARY—EXTRAJUDICIAL CONFESSION.

In a prosecution for homicide, where defendant was charged with killing the new-born illegitimate child of her daughter, the extrajudicial confession of defendant that the child died through her neglect, unsupported by other evidence of the *corpus delicti, held,* insufficient to sustain conviction of manslaughter. CLARK, SHARPE, and STEERE, JJ., dissenting.

Exceptions before judgment from Lenawee; Hart (Burton L.), J. Submitted January 11, 1923. (Docket No. 137.) Decided June 21, 1923.

Matie Kirby was convicted of manslaughter. Reversed and defendant discharged.

*B. D. Chandler* and *J. N. Sampson,* for appellant.

*Merlin Wiley,* Attorney General, *O. L. Smith,* Assistant Attorney General, and *Leland F. Bean,* Prosecuting Attorney, for the people.

MOORE, J. On the evening of July 4, 1921, Dr. Charles S. Lane was called to attend Alice Kirby, defendant's daughter. He made an examination which satisfied him that she was about to become a mother, which information he immediately imparted to her mother. There was conversation between the doctor and defendant relative to delaying the operations of nature until Alice could be gotten away. The doctor administered a hypodermic to Alice with the idea that nature might be delayed and Alice could be removed.

. On use of confession in aid of other evidence to establish *corpus delicti,* see note in 68 L. R. A. 73.

The doctor returned to his office for his instruments. He made a second physical examination which satisfied him that she was to be delivered "right away." He observed on this visit that the opiate had taken effect and that the patient was under its influence. The defendant inquired of the witness as to the probabilities of the expected child being born alive, which inquiry the witness was unable, at that time, to answer. There was conversation between defendant and the witness to the effect that the child would not be born alive, and that if it was, it must be gotten away.

The doctor then left the Kirby home and returned in about 20 minutes. The expected child was born during the interval that he was absent. The doctor performed the usual functions of a physician, and rendered the necessary medical aid to both parent and child. The infant was handed to the defendant who placed it in a basket on some clothes. At this time all the parties, including defendant, were in the same room. The infant was lying face down in the basket. On observing this the doctor said to defendant: "The baby will smother in that position." Defendant replied: "Do you care?" The doctor said that he did. The doctor placed the child in the basket in proper position.

The doctor next saw the infant about 10 or 15 minutes later in the same basket, but down in the basement. It was a very hot day. The doctor gave the infant the attention that it required, such as tying the natal cord, and left the premises, going out the back way, at request of defendant. The infant was alive when last seen by the doctor. The doctor called at the Kirby home the next day but saw nothing of the baby. On this visit the doctor was informed by defendant that her husband had taken the baby away.

A birth certificate was made out by the doctor and filed.

Bennett Houston, a witness for the people, testified that on the night of July 4, 1921, at about the hour of 12 p. m. while sitting on his porch at his home which was adjacent to the Kirby home, he heard the sound of a child crying. The fact that a child had been born to Alice Kirby became a matter of public knowledge. Complaints were made to the prosecuting officers of the county, which resulted in official action. Hartwell J. Shaw and Thomas B. Thurlby, deputy sheriffs of the county, went to the Kirby home in Hudson for the purpose of making investigations.

Hartwell J. Shaw, a witness for the people, testified that in company with Deputy Thurlby he visited the Kirby home on or about the 21st day of July, 1921; that on this visit defendant stated to him that the child was dead, and that her husband, Charles, had taken it away; that the child had not lived quite an hour. We quote from the testimony:

"I said to her then: 'What ailed the child?' She said that it had died through her neglect. She said: 'You know that I couldn't take care of the child and my daughter too, and my daughter came first.'"

There was further conversation in which the defendant again stated that the child was dead.

Thomas B. Thurlby, who accompanied Shaw, a witness for the people, testified to substantially the same conversation. His version is as follows:

"Why, she said that it had died from neglect, and I asked her, whose, and she said: 'From my own neglect because I couldn't take care of the child and its mother too.'"

Defendant's daughter, Alice, was present when the conversation took place, and her version of what was said differs somewhat from the statements made by

witnesses Shaw and Thurlby. She was sworn as a witness for the people, and testified that Shaw said to the defendant: "Then the baby must have died from neglect," and that defendant then said "call it what you may, but my first duty was to my daughter, I was caring for her."

Defendant's husband, Charles Kirby, the daughter, Alice, were both arrested without complaint or warrant and lodged in the county jail. Later, cousins of defendant's husband, residing in Hillsdale county, were likewise arrested, and lodged in the Hillsdale county jail. All were ultimately released without any charge being laid against them. The defendant, Matie Kirby, was arrested on the charge of murder, on complaint and warrant. An examination was had, and she was bound over to the circuit court and informed against on the charge of murder in the first degree.

At the close of all the testimony counsel for defendant moved for a directed verdict for several reasons, among them:

"(1) There is not a scintilla of evidence in this case showing the death of this baby, except the statements or alleged statements of the defendant, and it is the universal holding of the courts of the land that no statements or confessions of defendants can be used until the *corpus delicti* is established by some other proof. * * *

"(2) There is absolutely no proof of any kind that if the infant is dead that it was caused by criminal agency, and that is another necessary element and must be shown outside of statements of the defendant. * * *

"(3) Even though they had shown that the infant was dead, and that it was caused by a criminal agency, there is absolutely no proof in this case to connect this defendant with that agency, and there is nothing here to go to the jury." * * *

The trial judge seemed to be in doubt as to what he ought to do, but decided to take the verdict of the jury. He instructed the jury that under the evidence they could not convict of murder in the first degree, or murder in the second degree, but he would leave to the jury the question of manslaughter. We quote from the charge:

"Manslaughter is the unlawful and felonious killing of another, without malice, either express or implied.

"To warrant a conviction of manslaughter you must find under the evidence and these instructions beyond all reasonable doubt, four things:

"(1) That the baby was born alive.

"(2) That the baby referred to in the information is dead.

"(3) That the baby came to its death by criminal means.

"(4) That this defendant was the criminal agent that caused the death."

The jury returned a verdict of manslaughter. The case is here on exceptions before sentence.

It is claimed by counsel for the defendant that the extrajudicial statements of defendant should not have been received, and with them eliminated that only the first proposition submitted to the jury by the judge had been proven.

It is also claimed that with the extra-judicial statements received the proofs fall short of showing beyond a reasonable doubt the truth of either of the last two propositions submitted to the jury and that a verdict of acquittal should have been directed.

An interesting case is that of *People* v. *Roach*, 215 N. Y. at p. 600 (109 N. E. 618, Ann. Cas. 1917A, 410).

The case of the *People* v. *Simonsen*, 107 Cal. at p. 346 (40 Pac. 440), discusses the question of *corpus delicti*. We quote:

"The term of '*corpus delicti*' means exactly what it says.   It involves the element of crime.   Upon a charge of homicide, producing the dead body does not establish the *corpus delicti*.   It would simply establish the *corpus;* and the proof of the dead body alone, joined with a confession by the defendant of his guilt, would not be sufficient to convict.   For there must be some evidence tending to show the commission of a homicide before a defendant's confession would be admissible for any purpose."

Counsel for each side cite a great many authorities, the effect of which is to show there is a conflict among them, but we think it not necessary to go outside of our own State.

In *People* v. *Lambert*, 5 Mich. 365 (72 Am. Dec. 49), it was said:

"The only other question of importance in this case is, Whether a prisoner may be convicted of polygamy upon his own confession, merely, of the first marriage.
"It is declared by Russell and Roscoe to be a matter of doubt.   1 Russ. on Crimes, 217, 218; Roscoe Cr. Ev. 312.   *Truman's Case*, there referred to, was not a case of mere confession, but there was also documentary evidence.   In *Regina* v. *Simmonsto*, 1 Car. & Kir. 164, where the admission was of a marriage very much like the first marriage here alleged, that is, of a marriage in New York by a Presbyterian minister, it was doubted whether the admission was enough to prove the marriage to have been a valid one under the laws of New York.   The judge allowed the case to go to the jury advising them that the law of New York was material; and a verdict was found of not guilty.   The subsequent cases decided, in effect, that a foreign law could not be proved by any such testimony.   And in *Regina* v. *Flaherty*, 2 Car. & Kir. 781, it was held expressly that there must be evidence of the first marriage beyond the mere admission of the prisoner.   The English law must, we think, be considered as against allowing a conviction for this offense on mere admissions.   There is a consideration hinted at in some of the cases which has

much force.   An admission of a valid marriage, is an admission of law as well as of fact, and such admissions are never regarded as of much weight; and certainly never ought to satisfy a court of what the law is, where that becomes material.   1 Greenl. Ev. § 96.   Mr. Greenleaf expresses the opinion that the *corpus delicti* should be proved by other evidence before a conviction should be permitted.   It was so held in a case of bigamy by the supreme court of New York, in *People* v. *Humphrey*, 7 Johns. 314.   And this law has since been recognized in several cases in that State.   See *Gahagan* v. *People*, 1 Park. Cr. R. 378.   There are undoubtedly some authorities to the contrary; but the weight of reason is, we think, in favor of requiring further evidence.

"Some confusion has been created by not distinguishing between the various kinds of confessions.   A deliberate confession in open court is treated as sufficient evidence, always, as far as it goes, if made on the trial of the cause, and perhaps even on the preliminary hearing, provided it is made freely.   It is regarded as proof on the same principle with a plea of guilty, because the accused can not be supposed to act without consideration.   But confessions made extrajudicially are often misunderstood, and easily perverted.   It will be found that very few, if any, convictions have been allowed without some cumulative evidence.   See *People* v. *Hennessy*, 15 Wend. (N. Y.) 147, for some remarks on this subject.   *   *   *

"No doubt in these, as in all other criminal prosecutions, circumstantial evidence of a conclusive nature may often avail, where direct testimony is inaccessible. But it must be testimony not reasonably capable of any other interpretation.   It must be testimony from which nothing but guilt can, in the natural order of things, be deduced.   *Commonwealth* v. *Webster*, 5 Cush. (Mass.) 295 (52 Am. Dec. 711)."

In the case of the *People* v. *Hall*, 48 Mich. at p. 484, (42 Am. Rep. 477), Justice CAMPBELL, speaking for the court, said:

"As there are other defects which must lead to a new trial, we need not now go further in this dis-

cussion beyond the suggestion that this is only one of several indications that the trial lacked some of the elements of a calm judicial proceeding, and that matters appear to have been lost sight of which the rules governing the administration of justice required those conducting the prosecution to keep in mind.

"The first of these, and one which in several different ways was brought to the attention of the court below, but ruled against, was the rule which requires the *corpus delicti* to be shown, before any other testimony is directed against the prisoner. In many and perhaps in most cases the order of proof is not very essential. But in cases of homicide and in others where justice demands it, the prosecution should not be allowed to proceed further until the death and its character shall have been shown, as far as the testimony can be separately given, and especially so far as can be shown from the *post mortem* examinations."

In a case where defendant was charged with the attempt to kill and murder, Justice COOLEY, speaking for the court, said:

"The respondent was convicted of an attempt to murder one Allen by administering morphine to him. The evidence that any such offense was committed was the respondent's admission. * * *

"An unsupported confession should not be received as sufficient evidence of the *corpus delicti*. *People* v. *Hennessy*, 15 Wend. (N. Y.) 147; *Stringfellow* v. *State*, 26 Miss. 157 (59 Am. Dec. 247); *State* v. *Guild*, 5 Halst. (N. J. Law) 163 (18 Am. Dec. 404). The respondent on the case submitted to the jury was entitled to an acquittal, and the conviction must be set aside and a discharge ordered." *People* v. *Lane*, 49 Mich. 340.

In *People* v. *Swetland*, 77 Mich. 53, Justice MORSE, speaking for the court, said:

"It is claimed that, until the *corpus delicti* was proven, the statements of the respondent to Knappen were not admissible. There are some cases where the *corpus delicti*—generally in homicide—is clearly

separated and distinct from the question as to who committed the offense, if any is found to have been committed.    In such cases the evidence to establish the *corpus delicti* must first be given, before acts or admissions of the accused can be put in evidence."

See *People* v. *Ranney*, 153 Mich. at p. 295 (19 L. R. A. [N. S.] 443).

In one of the last cases in which an opinion was written by Justice STONE, he expressed himself as follows:

"Did the court err in its ruling with reference to the necessity of first proving the *corpus delicti?*    We recognize the rule that the death and its character should first be shown, as stated in *People* v. *Hall,* 48 Mich. 485 (42 Am. Rep. 477).    See, also, *People* v. *Swetland,* 77 Mich. 53; *People* v. *Ranney,* 153 Mich. 293 (19 L. R. A. [N. S.] 443), and *People* v. *Kimbrough,* 193 Mich. 330.    We have called attention to the early testimony in the case relative to the statement of the defendant that an Indian had killed Liberty, and also the testimony of Mathews referring to the examination of the body and its condition.    We think that this rule requiring the showing of the *corpus delicti* in a homicide case, before the admission of other testimony, is a wise one that should be observed in the trial of such cases.    We do not understand that it is necessary, however, to show the finding of the dead body, and its condition by medical testimony; and we think that the rule laid down heretofore by us was substantially complied with in this case in the evidence of the finding of the dead body, and the appearance of the head and face of the deceased, showing acts of violence.    There was later ample medical testimony.    We think however that trial courts cannot be too particular in following the wholesome general rule that in such cases it is necessary to prove the *corpus delicti* first.    That there are exceptions where the same set of facts, in cases of circumstantial evidence, tend to connect the defendant with the commission of the crime, and also at the same time to prove the *corpus delicti* has been held, and the rule has been somewhat relaxed in such cases." *People* v. *Jackzo,* 206 Mich. 183.

We do not think a case of homicide in this court can be shown where a different rule has been allowed.

The case of *People* v. *Pretswell*, 202 Mich. 1, does not relax the rule. In that case there are two opinions. The first one favors a reversal because the *corpus delicti* was not shown. The second opinion favors affirmance because counsel admitted in open court that the death of the boy was established.

In *People* v. *Kimbrough*, 193 Mich. 330, the court was of the opinion that inasmuch as the little girl whose death was charged, when last seen, was near the manufacturing plant where the defendant attended the furnace, and human bones of a child of her approximate age were found in the ashes, that the jury were justified in finding the *corpus delicti* proven.

In the instant case no witness testified that the babe was dead. No one found its remains, though the back yard was dug up, cemeteries were searched, and the furnace was examined. We think under the authorities cited it should be held that the people have failed to show beyond a reasonable doubt that defendant is guilty of manslaughter.

The judgment is reversed and the defendant is discharged.

FELLOWS, J., concurred with MOORE, J.

WIEST, C. J. (*concurring*). I am for reversal. This court has ever been firm in requiring proof of the commission of a crime outside of an extrajudicial confession. This fundamental principle, imbedded in our system of criminal jurisprudence, has always stood as an unalterable measure of justice, and its proposed departure cannot receive my sanction. Any other rule does not, in case of claimed homicide, establish death by criminal means beyond peradventure. History records many deplorable errors committed

when the safe rule has not been observed. Witchcraft insanity refused the rule and men, women and children confessed themselves witches and were burned.

Inability to show a crime has been committed lets down no bars and removes no safeguards. To indulge the presumption necessary to sustain this conviction is almost like going back to the statute, 21 Jac. 1, c. 27, by which it was enacted, "that any woman delivered of a bastard child, who should endeavor to conceal its birth, should be deemed to have murdered it, unless she prove it to have been born dead." This perversion of first principles of justice, Best, in his work on Evidence, says, remained a reproach on the English statute book until removed by 43 Geo. 3, c. 58, s. 3.

I cannot agree with Mr. Justice SHARPE in his construction of the rule relative to corroboration of a confession. I had supposed the question settled in this State that the *corpus delicti* must be established *aliunde* a confession. *People* v. *Ranney,* 153 Mich. 293. It is true cases found in the books speak of evidence in corroboration of a confession, but it seems to me that this is a loose and misleading statement, and the true rule is the one requiring evidence of the *corpus delicti dehors* the confession. Such a rule does not require a confession itself to be corroborated, but demands proof in addition to an extra-judicial confession that a crime has been committed. The corroborating circumstances, with reference to a confession, are not such as serve to strengthen or render it more probable but refer to facts which concern the *corpus delicti.* 16 C. J., p. 736, note 46, c. 2. An extrajudicial confession does not warrant a conviction unless it is corroborated by independent evidence establishing the *corpus delicti.* This is so clearly the rule that, under all authority, a conviction will stand although a confession is uncorroborated otherwise

than by proof of the *corpus delicti.* 16 C. J. *supra,* note 50.

It is anomalous to say the *corpus delicti* must be established *dehors* the confession, and then say the evidence is sufficient if, when considered with the confession, it appears that a crime has been committed. The confession is either plenary proof of the *corpus delicti* or no proof at all upon that subject. The *corpus delicti* cannot be established by a surmise supplemented by a guess. An inference cannot be based upon an inference. The inference of death, drawn from the disappearance of a helpless infant, warrants no inference that its death was occasioned by criminal means. Cooley's Constitutional Limitations (7th Ed.), p. 444, states the true rule:

"A confession alone ought not to be sufficient evidence of the *corpus delicti.* There should be other proof that a crime has actually been committed; and the confession should only be allowed for the purpose of connecting the defendant with the offense."

The confession of a defendant charged with homicide cannot be taken as evidence of the fact of the death of a human being by criminal means. In cases of homicide the *corpus delicti* may or may not be established by evidence disclosed by a dead body. If a body discloses death occasioned by criminal means then the *corpus delicti* is made out. If a dead body does not furnish such proof then death by criminal means must be shown to establish the *corpus delicti.* If the body, or remains thereof, cannot be produced, death by criminal means must be shown in order to establish the *corpus delicti.*

In the case at bar it was necessary for the prosecution, *aliunde* the confession, to establish the death of the infant by criminal means. If so established, then defendant's confession that she committed the offense was competent, otherwise not. If it be conceded that

the child is dead, such fact establishes no crime, for we still have the question of whether such death was occasioned by criminal means. Without defendant's confession there is not a word of proof, direct, circumstantial or presumptive upon this essential element of homicide. I stand squarely for the rule requiring the fact that the crime charged has been committed to be established without the aid of the confession. When this is attempted on this record, a signal failure of evidence is disclosed.

The *corpus delicti*, or criminal fact, is a thing apart from finding the criminal. Is defendant's confession plenary evidence upon the cause of the death of the infant? No. In case the death of the infant is shown to have been by criminal means then, and not until then, may her confession be taken that she is the criminal. There can be no criminal without a crime in fact committed.

I have examined the cases cited by my Brother SHARPE, and they have not shaken my faith in the Michigan rule. I notice in the cases cited by Justice SHARPE, in support of the rule he adopts, that the opinions point out the sufficiency of the proof of the *corpus delicti*, unaided by confessions.

I do not understand that the case of *People* v. *Lapidus*, 167 Mich. 53, holds that the commission of a crime may be established by an extrajudicial confession. If such is the purport of that decision, it is here overruled.

Is the infant dead? If so, what caused his death? Was his death occasioned by criminal means? The last question cannot be answered in the affirmative upon this record, and I concur with Mr. Justice MOORE in discharging the defendant.

McDONALD and BIRD, JJ., concurred with WIEST, C. J.

SHARPE, J. (*dissenting*). The rule stated by Mr. Justice MOORE that the *corpus delicti* may not be proven by an extrajudicial confession alone seems to be well established in this State, since *People* v. *Lane*, 49, Mich. 340, was decided.    It has been consistently followed in the cases cited and quoted from by him. The reason for this rule is stated in the early case of *People* v. *Lambert*, 5 Mich. 349, 366, where it is said that "confessions made extrajudicially are ofter misunderstood, and easily perverted."    That the *corpus delicti* may be proven by circumstantial as well as by direct evidence admits of no doubt under our Michigan decisions.    *People* v. *Hawksley*, 82 Mich. 71, 73; *People* v. *Parmelee*, 112 Mich. 291; *People* v. *Kimbrough*, 193 Mich. 330.    Others will be found collected in the note to *Bines* v. *State*, 68 L. R. A. 75 *et seq.* (118 Ga. 320, 45 S. E. 376).

In 13 R. C. L. p. 737, it is said:

"By the great weight of modern authority, it is established that the *corpus delicti* may be proved like any other fact—by presumptive or circumstantial evidence."

Must the proof of the *corpus delicti* offered, independent of the confession, be sufficient in itself to justify its submission to the jury before the confession can be received?    This question was answered in the negative in *People* v. *Lapidus*, 167 Mich. 53, 56.    It was there said?

"There is abundant authority to the effect that the *corpus delicti* cannot be proved by the naked extrajudicial confession of the accused, but we are not prepared to say that the direct evidence, slight and unsatisfactory as it was, constituted no evidence of respondent's guilt.    Where there is any evidence of the *corpus delicti dehors* the confessions, the confessions themselves become admissible.    *People* v. *Hess*, 85 Mich. 128; *People* v. *Ranney*, 153 Mich. 293 (19 L. R. A. [N. S.] 443)."

I do not think this court intended to lay down any different rule in *People* v. *Ranney, supra,* or in *People* v. *Jackzo,* 206 Mich. 183.    It is supported by the great weight of authority.

"As to the *corpus delicti,* the evidence need not be direct, but it may be established by circumstances corroborating the confession, and the confession itself may be considered, together with all the other evidence, to establish the fact that a crime was committed."    2 Wharton's Criminal Evidence (10th Ed.), p. 1315.

"The independent evidence of the *corpus delicti* need not of itself be full and conclusive or sufficient beyond a reasonable doubt, as the confession may be considered with the facts and circumstances in evidence in determining whether the *corpus delicti* is established."    16 C. J. p. 736.

"The corroborative evidence need not be such as would be required to convict the accused independently of the confession."    12 Cyc. p. 484.

"But if the facts extrinsically proved by the State corroborate the confession of the prisoner, positive evidence of the *corpus delicti* is not indispensable to admit the confession in evidence, and such evidence taken together will support a verdict of guilty if the jury is persuaded of the guilt of the prisoner beyond a reasonable doubt."    13 R. C. L. p. 739.

"Extra-judicial confessions, alone and uncorroborated, are, by abundant authority and with little dissent, deemed inadequate to establish the *corpus delicti.* Yet slight corroboration may suffice."    2 Bishop's New Criminal Procedure, § 1058.

"It is, however, regarded as sufficient when independent evidence, circumstantial or direct, of the *corpus delicti* is furnished to such an extent that when united with the probative force of the confession itself all reasonable doubt is excluded by it.    Slight corroboration may suffice for the purpose."    2 Chamberlayne on Evidence, § 1600.

"It is not necessary that the *corpus delicti* be established by proof entirely independent of confession." Wharton on Homicide (3d Ed.), p. 904.

"The evidence offered in corroboration need not be sufficient alone, aside from the confession to convince the jury of the guilt of the accused beyond all reasonable doubt, but if from the evidence of the *corpus delicti* considered with the confession of the accused, the jury believe beyond a reasonable doubt that the prisoner is guilty a conviction will be sustained." Underhill on Criminal Evidence (2d Ed.), § 147.

In 3 Wigmore on Evidence, § 2070, the writer refers to the fact that the English courts seemed unwilling to state any fixed rule. He, however, quotes from *Reg.* v. *Unkles*, Ir. R. 8 C. L. 50, 58, as follows:

"The rule is rather one of judicial practice than part of the law of evidence. * * * It would perhaps at present be more correct to define it thus, that a party accused of homicide ought not to be convicted on his own confession merely, without proof of the finding of the dead body or evidence *aliunde* that the party alleged to have been murdered is in fact dead."

His comment follows:

"The policy of any rule of the sort is questionable. No one doubts that the warning which it conveys is a proper one; but it is a warning which can be given with equal efficacy by counsel or (in a jurisdiction preserving the orthodox function of judges) by the judge in his charge on the facts. Common intelligence and caution, in the jurors' minds, will sufficiently appreciate it, without a laying on of the rod in the shape of a rule of law. Moreover, the danger which it is supposed to guard against is greatly exaggerated in common thought. That danger lies wholly in a false confession of guilt. Such confessions, however, so far as handed down to us in the annals of our courts, have been exceedingly rare (*ante*, § 867). Such a rule might ordinarily, if not really needed, at least be merely superfluous. But this rule, and all such rules, are to-day constantly resorted to by un-

scrupulous counsel .as mere verbal formulas with which to entrap the trial judge into an error of words in his charge to the jury.    These capabilities of abuse make it a positive obstruction to the course of justice."

"Full proof of the body of the crime, the *corpus delicti*, independently of the confession, is not required by any of the cases; and in many of them slight corroborating facts were held sufficient."    *People* v. *Badgley*, 16 Wend. (N. Y.) 53, 59.

The quotation from this case will be found in many of those in which this question is considered.

"On the trial of a criminal case a confession by the accused may be considered together with other evidence to establish the *corpus delicti*, provided such other evidence is of such character as will satisfy the mind that it is a real, and not an imaginary, crime which the accused has confessed."    Syllabus, *Patterson* v. *State*, 127 Miss. 256 (90 South. 2).

"The statute says the confession must be 'accompanied with other proof' that the offense was committed, and we think it does no more than announce the general rule prevailing in this country that a confession must be corroborated by other testimony.    This corroborating testimony need not of itself, and independent of the confession, be such as to prove the commission of a crime beyond all reasonable doubt.    It is sufficient, in our opinion, if, when considered with the confession, it establishes beyond all reasonable doubt that a crime was in fact committed by some one."    *State* v. *Westcott* (a murder case), 130 Iowa, 1, 8 (104 N. W. 341).

"We know of no decisions any where that hold the admissions of the defendant are not competent evidence tending to prove *corpus delicti*, but they certainly are competent evidence tending to prove that the crime charged has been committed."    *State* v. *Hall*, 31 W. Va. 509 (7 S. E. 422).

"There must be such extrinsic corroborative evidence as will, when taken in connection with the confession, establish this fact in the minds of the jury

beyond a reasonable doubt." *State* v. *Jacobs*, 21 R. I. 261 (43 Atl. 31).

"We consider the true rule, as deduced from the current of authorities, to be, that an extrajudicial confession, with extrinsic circumstantial evidence satisfying the minds of a jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction, although the dead body has not been discovered and seen, so that its existence and identity can be testified to by an eye-witness." *State* v. *Lamb* (a murder case), 28 Mo. 218.

See, also, *State* v. *Patterson*, 73 Mo. 695, 713; *State* v. *Henderson*, 186 Mo. 473, 484 (85 S. W. 576).

"A confession is sufficient if there be such extrinsic corroborative circumstances as will, taken in connection with the confession, produce conviction of defendant's guilt in the minds of a jury, beyond a reasonable doubt." *Jackson* v. *State* (where the murder of an infant was charged), 29 Tex. Ct. App. 458 (16 S. W. 247).

"Full proof of the body of the crime, the *corpus delicti*, independently of the confession, is not required.    It may be proved by the confession itself, corroborated by other evidence." *State* v. *Banusik* (a murder case), 84 N. J. Law, 640 (64 Atl. 994).

An instructive Federal case is *Flower* v. *United States,* 116 Fed. 241.

"We think that the rule concerning the *corpus delicti* is largely one of caution, and that where the corroborating circumstances so far supplement the confession as to make it clear that the crime charged was committed, a conviction should not be overthrown for the want of evidence." *Griffiths* v. *State*, 163 Ind. 555, 559 (72 N. E. 563).

I refrain from further quotation.    A comprehensive note and discussion will be found in 68 L. R. A. 73 *et seq.*    The conclusion reached by the writer of the note reads:

"While the confession of the accused alone is insufficient to sustain a conviction for the crime with which he is charged, and other evidence of the *corpus delicti* is essential thereto, yet the confession may be taken into consideration in connection with such other evidence in establishing the *corpus delicti*.    *    *    *

"Not infrequently the evidence which tends to, and does, prove the existence of the *corpus delicti* tends also to connect the accused with the crime; and in such cases the evidence is proper for both purposes."

Was the corroborative evidence sufficient? The testimony justified a finding of the following facts:

(1) A normal, healthy, illegitimate, male child was born to Alice Kirby between 10 and 11 o'clock of the night of July 4, 1921, at the home of her parents in Adrian.

(2) Before his birth, the defendant said to the doctor in attendance that she "was hopeful that the child would not be born alive, and that if it was born alive, it must be gotten away, or gotten away with, or done away with, or something like that."

(3) The defendant and the mother of the child were both anxious to conceal the fact of his birth from their neighbors and friends in Adrian. They advised with the doctor as to the best means to secure this result, but the birth, sooner than expected, prevented anything being done to that end.

(4) Soon after birth the defendant placed the child face downward on some clothing and when the doctor called attention to it she responded: "Do you care?"

(5) Soon after, the child was taken by the defendant to the basement of the house and left there. On inquiry of the doctor, she showed him where it was. No clothing had been prepared for him. After treating him, the doctor was requested to and did leave the house by a back way, shown to him by defendant.

(6) The doctor before he left directed the defendant to place the child at the breast of his mother for nursing in about three hours. The mother testified that this was not done and that she did not see her child after his birth.

(7) The child was left by the doctor in the care and

custody of the defendant.    No other person was
present except the defendant, her husband and the
mother of the child.    When the doctor returned the
next morning, the child was not at the home.    He
was not thereafter seen alive by any other person
nor was his body afterwards found, although a very
thorough search was made by the investigating officers
in all places in which it was thought he might be
buried.

(8) Cries of the baby were heard by a neighbor
about an hour after the doctor left the house.

(9) The mother of the child was observed by neigh-
bors to be out of bed and around the house on the
afternoon of the second day after the child was born,
and on the seventh day she walked alone from the
house to an automobile in the street and drove about
12 or 15 miles.

(10) The certificate of birth required by the statute
was made and filed by the doctor.    No certificate of
death was filed in that county.

In my opinion, these facts and circumstances suf-
ficiently corroborated the defendant's confession to
justify its submission to the jury.    To establish the
*corpus delicti*, the burden was on the prosecution to
prove that the child was born alive and had died and
that his death was brought about by wrongful or
criminal conduct on the part of some person.

What inference might the jury legitimately draw
from the disappearance of the child under the circum-
stances?    He was left by the doctor in the care and
custody of the defendant, his grandmother, at her
home about 11 o'clock at night, and the next day about
noon he was not there.    Where did he go and who
took him away?    He could not have destroyed him-
self nor could he have left the house of his own volition.
While he may have been removed alive and may yet
be so, would any reasonable person be likely to so
infer, in view of the circumstances attendant on his
birth, the expressed hope of the defendant that he
might not be born alive, the expressed purpose that if

he was he "must be gotten away, or gotten away with," and her treatment of him after his birth? The jury were at liberty to draw any reasonable inference from these facts and circumstances.   Can we say as a matter of law that they had no tendency to prove that the child was dead and that his death was brought about by the wrongful or criminal conduct of some person?   The motive for such conduct on the part of the defendant was apparent, the means were at hand, the opportunity then present.   In my opinion, this proof was sufficient corroboration of the facts stated by defendant in her confession to justify its submission to the jury and, when considered with it, to warrant the finding that the *corpus delicti* was established beyond a reasonable doubt.   Attention is called to the fact that the defendant told the doctor that her husband had taken the child away. This statement is in the nature of an admission by her and is no more entitled to be considered than the statements in the nature of an admission or confession made by her to the officers.

It is suggested that a different rule should be applied in homicide cases from that where other felonies are charged.   It is true that in nearly all cases of homicide the body or some part of it is found and there is usually some evidence by identification.   In such cases, the manner of death can be accounted for independent of any statement of the person accused. The law always requires that the best evidence attainable to prove a fact shall be produced, and in such cases it is no hardship to require that the *corpus delicti* shall be established by competent proof before resort is had to a confession.   The rule that the order of proof must be followed in such cases is not a harsh one, though I think but few, if any, cases will be found where a reversal was had because it had not been observed.   *People* v. *Kimbrough, supra.*

Cases of infanticide, so far as they appear in court reports, are rare and present questions peculiar to them alone. The body of a newly-born infant can be so easily destroyed or its burial secreted that to require direct proof of death would, in most cases, but place a premium on such crimes. In an early day Lord Hale announced the rule that "I would never convict any person of murder or manslaughter, unless the fact be proved to be done or at least the body found." 2 Hale P. C. 290. But this rule has no followers among the courts or text-writers at the present day. A very illuminating discussion of the proof necessary to establish felonious homicide appears in *Commonwealth* v. *Williams,* 171 Mass. 461 (50 N. E. 1035). The opinion was written by Mr. Justice Holmes, now a Justice of the United States Supreme Court. It is said (p. 462):

"Evidence which is colorless taken by itself, which establishes neither a constituent nor a fact pointing by inference to a constituent of a crime, may be made significant by other evidence, and so may be made admissible. It need not be self-justifying without regard to the other circumstances proved. *Common-Wealth* v. *O'Neil,* 169 Mass. 394 (48 N. E. 134). What is true of any part of the evidence is true with regard to the whole of it. And it also is true, in this Commonwealth at least, that there is no one dominant part of the case which must be proved as directly as possible in the nature of things before evidence of a remoter kind is admissible to connect the defendant with the supposed crime. No doubt the jury ought to be very sure that a crime has been committed before they convict a person of having committed it. But even upon an indictment for murder, the evidence of the death as well as of every other material fact may be insufficient singly, and yet the evidence taken as a whole may leave no reasonable doubt of the crime or of the defendant's guilt. The facts in a circle support one another, when if any one were withdrawn they all would fall to the ground."

The question here presented is exhaustively discussed in *Regina* v. *Woodgate*, 3 New Zealand Ct. App. 320. The defendant was charged with the murder of a newly-born infant which had been taken away by him soon after its birth. In considering the weight to be given to the fact of disappearance, it was said:

"Moreover, the probability that the child was alive and continued to be alive after the prisoner took it away, or that he disposed of it in a way that did not cause its death, seems so remote, that a jury would hardly have felt bound to act upon it, even if there had been no evidence of admission by the prisoner that he had smothered the child. The case differs very much in this respect from cases of adult persons who have disappeared, and have been erroneously supposed to have been murdered."

I find no authority holding that a different rule prevails in homicide cases from that applicable to other felonies. All are governed by the rule that the *corpus delicti* must be established independently of the confession, if proof thereof may be made. Proof of death and its cause can always be produced when the body is found. When it cannot be found, proof of the *corpus delicti* is governed by the same rules as apply when other felonies are charged.

Rev. Carlos Adams, a Methodist Episcopal clergyman, in whose church defendant was a communicant, visited the defendant at her home and later in the jail at the request of the prosecuting attorney, with a view of ascertaining where the child was. To him the defendant said "that when she made the statement to the officers that the baby was dead she told a lie. She said the last time she saw the baby that the baby was alive."

There was no denial on the part of the defendant that she had made the statements to the officers to which they testified. Without deciding whether this testimony was competent, in view of section 12549, 3

Comp. Laws 1915, in my opinion it was in no way prejudicial to the defendant.   On the contrary, it placed before the jury her denial that the statements made to the officers were true and also the fact that when she last saw the child he was alive.   This testimony could in no way have been harmful to her when considered by the jury.

It is insisted that the evidence taken as a whole was not sufficient to justify defendant's conviction.   It was defendant's duty to care for this child.   If he died because of her inexcusable neglect, she would be guilty of manslaughter.   Her excuse to the officers was that she could not take care of both the mother and the child.   The doctor testified that before leaving he gave the mother an opiate and she testified that she remained under its influence until the next morning.

A somewhat similar question was considered in *People* v. *Beardsley,* 150 Mich. 206 (13 L. R. A. [N. S.] 1020, 13 Ann. Cas. 39, 121 Am. St. Rep. 617). The authorities are there collected and discussed. Without extending this already lengthy opinion, I think there was sufficient proof to warrant the jury in finding that the death of the child was caused by the criminal neglect of the defendant.

The jury retired on Friday evening to consider the case.   After some time they were recalled by the court.   The foreman in response to a question said that he did not think there was any chance of a verdict being given that evening.   Counsel for the defendant expressed their assent that a sealed verdict might be delivered when an agreement was reached.   It is apparent that the jurors were provided with suitable sleeping accommodations.   The court then said to them: "I don't think I will require you to deliberate any more tonight."   He then delivered to them sheets of paper on which a verdict of "guilty of man-

slaughter" or "not guilty" was written and instructed them as to the manner of preparing a sealed verdict. He then said:

"Now you take these two forms to your room, the foreman, and if you reach a verdict tomorrow at any time, you announce to the officer that you have reached a verdict and he will let you go. But you are to come back here Monday morning at 9 o'clock. * * * I am not keeping you out until Monday morning to force a verdict, but there will be no court here until Monday to take a verdict, if you reach it, so you would have to stay until Monday anyway; but if you cannot agree, under the evidence and these instructions, you don't have to find any verdict, but you have got to stay until you do find one, until Monday at least. That is not said for the purpose of coercing you into a verdict, and you haven't got to sit up nights. You go to bed tonight, and in the morning the officers will give you breakfast and take you for a walk, and you deliberate tomorrow. If you reach a verdict in the forenoon, sign it up and put it in this envelope and seal it and tell the officers in charge that you have reached a verdict, and that you will be back Monday morning at 9 o'clock, and they will let you go, but the foreman will keep the verdict. * * *

"If there is no other suggestion, and you understand it in every way, the officers will take you to the hotel tonight for sleep, and after breakfast in the morning come to your jury room and do your deliberating. Sunday you don't need to work.

"A Juror: If we are satisfied in our own minds we can't reach a verdict, we still have to stay?

"The Court: You still have to stay. You have to reach one of those two verdicts to entitle you to go before Monday. You don't have to work Sunday, but, if you would rather, you can come down here to the jury room. But you are to stay in charge of the officers, unless you reach a verdict, and if you do you can tell the officers, report to the officers, but you are not to disclose what it is. Everyone be back Monday morning at 9 o'clock anyway, whatever the situation may be. Court will be in session from now until Monday morning, because you are a part of the

court and are working for the court while the court is sleeping."

Defendant's counsel urge that the jury were coerced into rendering a verdict and that she "did not receive, by reason of the charge of the court herein complained of, the individual verdict of each juror." The jury delivered a sealed verdict on Saturday evening. On Monday morning their verdict was formally taken. The jury were then polled. While a motion for a new trial was made, the error here assigned was not then presented or considered by the trial court.

Were the jury coerced into reaching a verdict by what was said and done by the trial court? If such a conclusion can be fairly reached, the conviction cannot stand. It is apparent that the jurors were provided with comfortable quarters and received their meals at the usual times. The purpose of the sealed verdict, and the necessity of their remaining together until Monday morning unless a verdict was sooner agreed upon, were made plain to them. With the propriety of such a course we are not here concerned. To reverse this case for this reason, we must be able to say that the possibility that one or more jurors yielded assent to the verdict in order to be released is so probable that we must presume it occurred. A similar question was before this court in *Stevenson* v. *Railway Co.*, 118 Mich. 651. We quote therefrom:

"It appears that the court charged the jury at 2:30 o'clock on Saturday afternoon. Among other things, he said to the jury:

"'Now, gentlemen of the jury, I am going home on this train; and if I go home on this train, and your verdict is not rendered, I shall adjourn this court until next Monday morning, at 9 o'clock; and I am going to give you this envelope and this piece of paper, and, if this court adjourns before your verdict is rendered, you will all write your verdict, —you will write your verdict on this paper, whatever you find,

223—Mich.—30.

and all sign it, fold it up, and put it into this envelope, and seal it tight, if you agree, and hand it to the sheriff, to be delivered to me when court convenes on Monday; and you will return here Monday, and take your places in the court-room, and I will open your verdict, and receive it.    You understand; I don't want any mistake about this.    I say, if the court is adjourned before you agree, you will write your verdict,—just what you find,—all sign it right underneath the verdict, fold it up, and put it in here, and seal it, and hand it to the sheriff, and go to your homes, and return here Monday morning, at 9 o'clock, and I will.'

"It is claimed that the verdict was obtained through coercion and restraint of the jury.    We cannot agree with this contention.    The jury sealed their verdict, and returned it into court on Monday morning, as directed by the court."

In the absence of a statute, trial courts had a right to rely on the holding that the course there pursued was not erroneous.    There was much more danger that coercion or restraint might result from the instruction there given than in that before us.    We feel constrained to hold that there was no reversible error in the action complained of.

The other errors assigned have been considered but do not merit discussion.

The conviction should be affirmed, and the trial court directed to proceed to sentence.

CLARK and STEERE, JJ., concurred with SHARPE, J.