### No. 9568.

### BLANDA ET AL. *v.* THE PEOPLE.

1. EVIDENCE—*Circumstantial,* is in many cases more reliable than direct evidence.

2. CRIMINAL LAW—*Failure of Accused to Testify in His Own Behalf,* is not to be taken as evidence of guilt; but where he fails to explain incriminating facts and circumstances that are peculiarly within his own knowledge, he accepts the chance that the jury may draw any reasonable inference from the whole evidence.

The evidence examined and held to warrant a conviction of the crime of murder.

3. ——*Motive.* Where the jury is satisfied of the guilt of the accused, beyond reasonable doubt, the fact that they are not able to ascertain the motive of the crime is no ground to acquit.

*Error to Pueblo District Court, Hon. Samuel D. Trimble, Judge.*

Messrs. STEWART & PHELPS, Mr. R. R. CLOUD, Mr. THOS. R. HOFFMIRE, Mr. SAM PARLAPIANO, for plaintiffs in error.

Hon. VICTOR E. KEYES, Attorney General; Mr. CHAS. H. SHERRICK, assistant, for the People.

Mr. Chief Justice Garrigues delivered the opinion of the court.

SUNDAY afternoon, August 11, 1918, Rogers and Owens had 18 cases (pints) of whiskey cached in a canon some seven miles from Pueblo, which one Mahar undertook to sell for them. He first tried defendant Blanda, who said he could not handle it. Blanda went in an automobile that afternoon with Mahar to Dragash's place of business. Dragash had run a saloon, but after the state went dry he and his wife ran what they called a soft drink parlor in the place. Blanda stayed outside in the car while Mahar went inside and negotiated the sale of the liquor to Dragash at $50.00 a case, to be delivered Monday night at a place outside of the city limits, which they were to select, and paid for in cash on delivery. Monday between 9 and 10 o'clock at night Dragash showed Mahar the place on the river bottom in the neighborhood of the stockyards at the south end of the county bridge over the Arkansas river, and about a mile or two from town, where he wanted the liquor delivered. It was agreed that Mahar would arrive at the appointed place with the liquor about 12 o'clock midnight or later, and Dragash would wait there for him until he arrived, and have the money ($900.00) to pay cash for the liquor on delivery. Mahar and Dragash then drove back to town, and Mahar, Rogers and Owens went in a car after the liquor, but did not get back as soon as they expected. They arrived at the place at 12:40 instead of 12, but no one was there. They waited until 1:30 for Dragash but he did not appear. During all this time they saw no one and heard no shooting or unusual sounds of any kind. They

then drove to Dragash's place of business in town where
he and his wife lived, arriving there about 1:45 in the morn-
ing, but Dragash was not there. He had been murdered in
his wagon while waiting at the place before Mahar arrived,
and his body was lying in the road down by the stockyards,
and Blanda was lying in a hospital up town with a fresh
bleeding bullet wound in his chest.

Dragash owned a horse and spring wagon, sort of a de-
livery wagon with a footboard projecting out in front, and
a 44 caliber revolver. On the night in question he drove
with his horse and wagon to the appointed place at or near
the south end of the river bridge, backed the wagon up
under a tree off to the side of the road and there waited for
Mahar. There is no direct evidence as to the exact time
when Dragash reached the place, but the tracks showed
that his horse and wagon were backed up and stood under
this tree before the horse ran away. He had with him at
this time $900.00 in money, and his 44 caliber revolver
loaded with five 44 caliber shells (shorts).

It so happened on this night a camper was camped with
his wagon at the side of the road near the north end of the
bridge, the stockyards lay some little distance beyond him
to the north, and Dragash's wagon stood at the south end
of the bridge. The camper's wife on the night in question
was up with a sick baby, and between 12 and 1 o'clock heard
three shots in rapid succession, coming from the direction
of the bridge. She looked out of the rear end of the camp
wagon and saw a horse running away with a spring wagon,
without a driver, going by, north in the direction of the
stockyards. It was Dragash's horse and wagon. The next
morning, about daylight his dead body was found in the
road opposite the stockyards where it had fallen out of the
wagon. There was a severe bruise over his forehead, a
severe bruise on the chest, three ribs were broken; in addi-
tion to this there was a gun shot wound through the wrist
and another in the chest. The ball had entered the chest
in front on a level with the left nipple, one inch to the left
of the median line, passed upward through the heart,

through the lung, and lodged in the tissues under the skin in the back from where it was removed. It came from a 45 caliber shell. The bullet through the heart produced practically instantaneous death. The next morning the horse was found, hitched to the wagon, and tied to a fence or post up town. Evidently someone had found it wandering around in the night and tied it up. There was blood on the shafts, singletree, footboard, seat, and considerable blood in the wagon. His revolver lay in the wagon. Only one shell had been exploded. It was a 44 caliber. The 4 loaded shells in the gun were 44's short, and the exploded shell was the same. The bullet taken out of Blanda's body was a 44 short, and exactly fit in the exploded cartridge. An examination next morning showed that the horse and wagon had stood under the tree near the south end of the bridge. The tracks showed the horse in running away had crossed the bridge going north, passed the camper's wagon, and on by the stockyards where Dragash's dead body was found thrown from the wagon. The $900.00 in money was found upon the body, and the revolver found in the wagon.

Shortly after the shooting, the defendant Marone arrived at a physician's home up town with Blanda in an automobile, and took him from there to the hospital. They arrived in the automobile at the hospital about 1 o'clock. Upon examination it was found that he had been shot and was bleeding from a freshly made gun shot wound, that the ball had entered his body in front on the left side of the chest high up near the first or second rib. A later examination showed that the ball had passed downward through his body and lodged in the back. The ball was removed from the left side of the back below the lower or 9th rib towards the spine. As stated before, it was a 44 short and fit exactly into the 44 short exploded cartridge taken from Dragash's revolver found in the wagon, and which he owned and had taken with him on the night of the fatal encounter.

A police officer testified that Marone told him that he was out riding with Blanda in an automobile until he got shot, and then took him to the hospital. The defense offered and introduced no evidence.

Garrigues, C. J., after stating the case as above.

In *Martinez v. The People,* 63 Colo. 347, 166 Pac. 242, where defendant was convicted of murder, Mr. Justice Bailey, speaking for the court, said: "Circumstantial evidence may be, and frequently is, most convincing and satisfactory. * * * Defendant was given an opportunity to explain under oath the many incriminating facts and circumstances presented by the state." So here, defendants were given an opportunity to explain any incriminating facts and circumstances in evidence on the trial. They did not have to explain. It was their privilege to keep off the witness stand and make no explanation, and the statute provides that a failure to testify shall not be taken or considered as any evidence of guilt or innocence, and they should be accorded every privilege and protection the statute affords. But when they failed to explain incriminating facts and circumstances in evidence on the trial that lay peculiarly within their knowledge, they took the chance of any reasonable inference of guilt which the jury might properly draw from the whole evidence. To illustrate, it is well understood, if one is found in possession of property recently stolen, and fails to give any reasonable explanation of how it came into his possession, the jury are at liberty to find him guilty of the theft, provided they are satisfied form all the evidence of his guilt beyond a reasonable doubt. He does not have to explain, in such a case; he can elect to keep still, and the fact that he refuses or neglects to testify cannot be considered by the jury or used against him, but he takes his chances in keeping still, when he has the opportunity of explaining, of the jury drawing any legitimate inference of guilt which his unexplained possession will warrant. The same principle may apply in a murder case, *Martinez v. The People, supra.* Defendants were under no obligation to explain, and the fact that they failed to do so could not be considered by the jury or used against them, but when they failed to explain incriminating circumstances that lay within their knowledge, they took a chance of any reasonable or legitimate inference being drawn by the jury

of their guilt which the evidence might warrant. In other words, it was defendants' privilege to rely on the statutory presumption of innocence without making any explanation, but if they chose this course, they took the chances of the jury being satisfied of their guilt, from the facts and circumstances on the trial. So it is simply a question of whether their guilt was a legitimate inference which the jury were warranted in drawing from the evidence.

A careful study and analysis of all the evidence shows beyond a reasonable doubt that an attacking party in an assault upon Dragash shot and instantly killed him as he waited in his wagon for Mahar. All the circumstances surrounding the killing show that Dragash was not the assailant but acted in self-defense. We think the jury were at liberty to find from the evidence that Blanda was wounded in this encounter. Of course, if this inference is not warranted, then the jury were not at liberty to make it. One shot was fired by Dragash and two by his assailants. Shortly thereafter Blanda arrived at the hospital bleeding from a freshly inflicted gun shot wound in the breast. An examination, followed by an operation, demonstrated that the ball had entered in front high up on the chest next to the 1st or 2nd rib, passed downward through the body and lodged in the muscular tissues of the back beneath the skin near the 9th rib, next to the spine. The gun fired by Dragash and the extracted bullet from Blanda were of exactly the same caliber, and the ball exactly fit the exploded shell, both were 44 short, and of the same caliber as the gun. The time of shooting coincides with defendants' subsequent arrival at the hospital, and the exploded shell in the gun fired by Dragash corresponds exactly with the caliber and exactly fits the ball extracted from Blanda. These are circumstances which could hardly happen by accident. Of course, it is possible, but such a possibility is not the question, the question is whether the jury were at liberty to draw the inference from the evidence that Blanda was wounded by the shot fired by Dragash. If they had given a reasonable explanation of the incriminating evidence, of

course the jury would not have been at liberty to draw the inference, but if they chose not to explain incriminating circumstances lying peculiarly within their knowledge when they had an opportunity, they cannot now complain because the jury drew a warranted inference from the evidence. Both Blanda and Dragash were shot in the front in the chest at short range while facing each other. Dragash was in his wagon alone at midnight waiting for Mahar. He was not the attacking party. He was shot and killed in his wagon and his dead body fell in the wagon, and was afterward thrown out by the horse running away. The assault was made from the ground. If Dragash had been shot while on the ground, his body would have been found there because he was instantly killed. It is not to be presumed that his assailant killed him on the ground and put him back in the wagon. No unbiased person can read and analyze this evidence with a view of reaching the truth without being convinced that Dragash was not the assailant. Circumstantial evidence in many cases is more reliable than direct evidence. There is no dispute here as to the evidence, and it is only a question of whether the jury were at liberty in finding the defendants guilty from the incriminating circumstances. We think they were.

But it is said there was no motive shown for the commission of this crime. Maybe not. Dragash had $900.00 on his person in cash. That could have been the motive. Because it was not taken is easily explained. Blanda was severely wounded and had to go immediately to the hospital, and the horse ran away with Dragash's dead body. The jury may not have been able to ascertain the motive. While it is said there is a motive for every crime, in fact for every human act, still in many cases it may be difficult to ascertain the motive; so here, there must have been a motive, and the fact that no motive was shown, if that be true, was a matter to be weighed and carefully considered by the jury, but the mere fact, if it be a fact, that the jury were unable to ascertain the motive, if they were satisfied of defendant's guilt from all the evidence on the trial be-

yond a reasonable doubt, would be no ground for acquitting. Sometimes it is impossible to ascertain motive, but that is no reason for acquitting one whose guilt is shown from the evidence beyond a reasonable doubt.    Judgment affirmed.

*Affirmed.*

Mr. Justice Bailey and Mr. Justice Allen concur.