No. 14,260.

ARRIDY *v.* THE PEOPLE.

(82 P. [2d] 757)

Decided July 11, 1938.   Rehearing denied September 19, 1938.

Mr. GAIL L. IRELAND, Mr. JAMES D. DOYLE, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. REID WILLIAMS, Assistant, for the people.

*En Banc.*

MR. JUSTICE BAKKE delivered the opinion of the court.

PLAINTIFF in error, Joe Arridy, defendant below, was convicted in the district court of Pueblo county upon an information charging him with the murder of one Dorothy Drain, and the jury fixed the penalty at death. He seeks a reversal of the judgment entered on that verdict.

The homicide was committed on August 16, 1936. The information was filed August 31st. Counsel was appointed for Arridy and leave was granted him to withdraw his plea of "not guilty," and enter a plea of not guilty by reason of insanity existing at the time of the commission of the crime and since. He was committed to the State Hospital at Pueblo for observation for a period of thirty days and a commission was appointed to examine his mental condition. He was given a separate trial from that of Frank Aguilar, with whom he was charged jointly with the commission of the crime, and who was found guilty and executed. On February 8, 1937, Arridy was tried to a jury on the sole issue of his sanity, and found sane. On March 20, 1937, at the time of the overruling of the motion for a new trial in the sanity case, the court set the homicide case for trial for April 12th, 1937, on which date the jury was selected, and the cause heard during the following four days. A verdict of guilty of first degree murder having been returned, motions for new trial, and to set aside the verdict were overruled and sentence pronounced June 25, 1937.

As to the crime itself, it would appear that on the evening of August 16, 1936, Aguilar and Arridy went to the Drain home in Pueblo, Aguilar having a hatchet. They hid in the bushes nearby and waited until the parents had left, then sneaked into the house and entered the bedroom where Barbara and Dorothy, sisters, were asleep. They got into bed with them, ravishing Dorothy, the older girl, then killing her by crushing her skull with the hatchet, and seriously injuring Barbara, the younger sister. They then departed, leaving the girls on the bed, and proceeding to Aguilar's home where they washed the blood from, and disposed of, the hatchet. Arridy caught a freight train and went to Cheyenne, where he was taken into custody on August 26th. On being questioned, he related the whole story to Sheriff Carroll. He then was returned to Pueblo where he assisted the officers in re-enacting the crime, everything being found substantially as related by Arridy to Carroll in Cheyenne.

The major question we are asked to decide is the sufficiency of the evidence to support the finding that Arridy had mental capacity to form a criminal intent. The evidence on this question was substantially the same at both trials, the same witnesses testifying at each. It is, therefore, only necessary for us to treat this as a review of the second trial.

Defendant's counsel urge seventy-five assignments of error, all of which, for the purpose of this review may be comprehended in the following general propositions: 1. Jurisdiction. 2. Presumptions and burden of proof. 3. Evidence insufficient to establish sanity. 4. Correctness of the instructions.

1. Defendant contends that because he had been adjudicated a mental incompetent by the county court of Pueblo county in 1925, such adjudication was res judicata as to his insanity, and, therefore, he could not again be legally tried on that issue in the district court. Such is not the law. In the first place, the institution to which he was sent was "The State Home and Training School

for Mental Defectives'' (not State Home for the Feeble Minded, as described by counsel), whose ''essential object * * * shall be the mental, moral, physical education and training of feeble-minded children and the treatment and care of persons so mentally defective as to be incompetent to care for themselves or their property.'' '35 C. S. A., vol. 4, c. 105, §48, 1921 C. L. §583. We think it does not follow from a commitment to such an institution that one necessarily is incapable of forming an intent to commit a crime.

It is to be noted particularly that the certificate to be issued by the county court in such cases requires only a finding that the one being committed falls into the class of ''feeble-minded persons, incapable of receiving instruction in the public schools, also epileptics and feeble-minded adults unable to care for themselves or their property.'' '35 C. S. A., vol. 4, c. 105, §52, 1921 C. L., §587.

Thus, it becomes apparent that the Pueblo county court was not called upon to pass on the question of insanity, and the New York case (*In re Clarkson,* 174 N. Y. S. 616), upon which defendant relies, has no application here, as a reading of that case will clearly disclose. The same is true of *In re Rainbolt,* 64 Colo. 581, 172 Pac. 1068, where the question arose out of an attempt to modify the commitment order of the county court.

To yield to defendant's contention on this point, would be to permit inmates of these training institutions to walk away, commit all degrees and character of crimes, and then find shelter under the order committing them to the institution. Such a proposition cannot be entertained.

2. Defendant's contention in regard to presumption and burden of proving insanity involves about the same kind of an argument; namely, that because defendant was feeble-minded in 1925, and still a ward of the state home when the crime was committed, a presumption is created that he still is incompetent. The rule on order of proof, supported by abundant authority, is:

"The people are not required in the first instance to offer proof of sanity, sanity being presumed in the absence of evidence tending to show the contrary. But when evidence is introduced tending to show insanity, the people have the burden of proving beyond a reasonable doubt the sanity of the defendant. Strictly speaking, the burden of proof does not shift. The defendant never has the burden of proving insanity. If, upon a consideration of all the evidence, the jury have a reasonable doubt whether the defendant was sane or insane at the time of the committing the act they must find the defendant not guilty." *Graham v. People,* 95 Colo. 544-546, 38 P. (2d) 87.

We think there was a literal compliance with the rule throughout both trials. Assuming that the commitment to the state home raised a presumption of continuity of his mental condition, whatever it was, the state introduced evidence to indicate that his mind was such at the time of the crime that he knew "the distinction between good and evil," and the only possible theory upon which defendant's contention can be supported is, that the testimony of the alienists was conclusive on this point. If there is any jurisdiction where that is the law, his counsel have failed to call it to our attention. Strictly speaking, the defendant's acknowledged status as a ward of the state was not here conclusive evidence of insanity; but, granted that the people had the burden "of going forward" with the evidence, that was done under a proper instruction, which we shall later set out.

3. Defendant's next contention is that there was no sufficient testimony to prove sanity, and that because of such insufficiency he was entitled to a directed verdict in the sanity trial, as well as in the murder trial, where his plea was, "not guilty by reason of insanity."

Before considering the nature, competency, weight and sufficiency of the evidence, it is well to have before us the controlling and informative statutory provisions on the subject in order to know what had to be established. The

controlling provisions, under the title, "Persons Capable of Crime" ('35 C. S. A., vol. 2, c. 48, pp. 946, 947, 1921 C. L. §§6633, 6634, 6635) are as follows:

"§1. What constitutes a crime.—A crime or misdemeanor consists in a violation of a public law in the commission of which there shall be an union or joint operation of act, and intention or criminal negligence.

"§2. Intention, how manifested.—Intention is manifested by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused.

"§3. Who is deemed of sound mind.—A person shall be considered of sound mind who is neither an idiot, nor lunatic, nor affected with insanity, and who hath arrived at the age of fourteen years, or before that age, if such person know the distinction between good and evil."

"§5. Lunatics—Not to be convicted for act when insane.—A lunatic or insane person without lucid intervals shall not be found guilty of any crime or misdemeanor with which he may be charged; provided, the act so charged as criminal shall have been committed in the condition of insanity."

In chapter 105, volume 4, '35 C. S. A., 1921 C. L., §549, under the title, "Lunatics and Other Mental Defectives," we find the following:

"§1. Definitions.—The term 'insane person,' as used in this article, shall be construed to include idiots, and any person so insane and distracted in his mind as to endanger his own person or property, or the person and property of another, or others, if allowed to go at large. The phrases 'incompetent,' 'mental incompetent,' 'incapable' and 'feeble-minded' as used in this article, shall be construed to mean any person who, though not insane, is by reason of old age, disease, weakness of mind, feebleness of mind, or from any other cause, incapable, unassisted, to properly manage and take care of himself or his property, and by reason thereof, would be likely to be deceived or imposed upon by artful or designing per-

sons.'' This is informative on degrees of insanity, but in no wise controlling in a case like the one here under consideration.

Now, as to the actual testimony in this case. The commission appointed by the court to examine the condition of the defendant's mind consisted of Doctors Zimmerman, Rosenbloom and Wolf of the Colorado State Hospital, men eminently qualified, and whose professional integrity is not questioned.

Their reports were as follows:

"November 16, 1936.

"This is to advise you that we have completed our observation and examination of Mr. Joe Arridy and find that he is mentally defective at this time and, in our opinion, was mentally defective at the time of the alleged commission of the crime."

"December 28, 1936.

"At the request of Mr. French L. Taylor, we are making you a supplementary report concerning the mental condition of Mr. Joe Arridy, who was admitted to this hospital on October 31, 1936, for observation.

"It is apparent from our examination and observation that Joe Arridy is mentally defective and has been over a period of many years. We believe he is incapable of distinguishing between right and wrong, and therefore, would be unable to perform any action with a criminal intent.

"In our opinion his mental condition on August 15, 1936, was practically the same as it is now."

Giving full faith and credit to all the testimony of the alienists, such as, that defendant had the mind of a five or six year old child, that he could not do simple arithmetic, that he could read only the simplest of words, that his memory was very faulty, nothing more is established than a case of weak-mindedness, and defendant's counsel admit that weak-mindedness is not in itself proof of insanity; that the general rule, throughout the United

States, as regards criminal responsibility, is an individual's ability to distinguish between right and wrong.

It also must be remembered that this ability to distinguish between right and wrong is not to be based upon some mental test given by alienists under ideal clinical conditions. The statute says, "intention is manifested by the circumstances connected with the perpetration of the offense." This is the reason why the argument of defendant's counsel as to the complete exclusion of any testimony, relating to the crime committed, on the sanity trial is without merit.

It was proper that the peace officers relate what their conversations with the defendant disclosed, and what defendant, himself, did after the crime was committed. He had intelligence enough to want to get out of Pueblo immediately and go to Cheyenne, where he was apprehended and where he told his story to the sheriff. After all, police officers under present day conditions have frequent contacts with these deranged mental cases in the actual work-a-day world, and, under our present system of jurisprudence, a jury is entitled, under proper instructions, to give such credence as it desires to the testimony and opinions of peace officers, based on such contacts.

Finally, on the matter of evidence. The defendant testified. Some of his answers to interrogatories given would indicate a very low intelligence quotient, but his appearance on the stand gave the members of the jury an opportunity to observe on their own account. It should be remembered that defendant was twenty-two years old, apparently physically normal, and the jury undoubtedly considered all of these factors in connection with the other evidence.

From this it clearly appears that there was sufficient competent evidence upon which the jury could properly find that defendant "was sane at the time of the commission of the alleged offense," and "has been sane since

the commission of the alleged offense.'' (Verdicts on the first, or sanity trial.)

4. Coming finally to the matter of instructions. The objections directed to a few words in a given instruction vanish when the instruction is read and considered as a whole and in relation to the other instructions given. The real question involved is whether the jury was properly instructed on the law concerning defendant's sanity. These instructions were as follows:

"Instruction No. 12. You are instructed that in this case, insanity is interposed by the defendant's counsel as one defense for the charge set forth in the information. This defense, when established, is one the law recognizes. The law presumes every person to be sane until the contrary is shown, but if the jury believe that there has been any evidence of insanity on the part of the defendant introduced in evidence, whether on the part of the state or on the part of the defense, which leaves in your mind a reasonable doubt as defined in these instructions as to the sanity of the defendant, your verdict must find that the defendant was insane at the time of the commission of the alleged offense and since. Insanity is a physical disease located in the brain, or a defect of mentality, which disease or defect so perverts and deranges one or more of the mental faculties as to render the person suffering therefrom incapable of distinguishing right from wrong in reference to the particular act charged against him.

"Therefore, if the jury believe from the evidence beyond a reasonable doubt that the defendant did the acts charged in the information, and further believe from the evidence that at the time the defendant did the acts charged in the information, he was so perverted or defective in one or more of his mental or moral faculties as to be incapable of understanding the nature of the act and that it was wrong, or had not the mental capacity to hold to the right and refrain from the wrong, your

verdict must find that the defendant was insane at the time of the commission of the alleged offense and since.

"The law does not excuse unless the defect of mentality is so great that it actually renders the person incapable at the time of the commission of the alleged offense of distinguishing between right and wrong in reference to the particular act charged against him, or being able to distinguish between right and wrong had not the mental capacity to hold to the right and refrain from the wrong."

"Instruction No. 13. You are further instructed that the defendant has introduced evidence to show that he was at the time of the commission of the alleged offense, and since, insane; that thereupon the burden rests upon the state to show and prove beyond a reasonable doubt that the said defendant was sane; that if the state has failed to prove beyond a reasonable doubt that the said defendant was sane at the time of the commission of the alleged offense and since, then you should find the defendant not guilty by reason of insanity at the time of the commission of the alleged offense and since."

"Instruction No. 14. The court instructs the jury that within the definition of the law, the term 'insanity' includes imbecility, or that the term 'insane person,' includes imbecile."

There may be some doubt as to the correctness of this last instruction, but since it was peculiarly favorable to the defendant, he will not now be heard to complain concerning it.

In conclusion, acknowledgment should be made of the commendable effort on the part of defendant's counsel and others to save Arridy from the death sentence. We are aware that such effort was prompted by the highest motives which move the hearts and minds of men, but until such time as the race, in its evolutionary process, can work out a more intelligent solution of cases such as is here presented, it remains the duty of courts only, to safeguard the rights of a defendant and see that

he has a fair and impartial trial under the law of the state as it now is, not under what we wish it might, or should, or may be at some time in the future.

The judgment is affirmed, and it is ordered that it be executed during the week commencing Monday, November 14, 1938.

MR. JUSTICE HILLIARD, MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND dissent.