## No. 15,492.

### WILLIAMS *v.* THE PEOPLE.
(158 P. [2d] 447)

Decided March 5, 1945. Rehearing denied May 7, 1945.

208

Mr. RALPH L. CARR, Mr. FRED M. MAZZULLA, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

DEFENDANT was convicted of murder in the second degree and of concealing the death of a bastard. At the time of her arrest she and her mother were residing together in an apartment house in Denver. She was unmarried and then twenty-three years old. She had lived in Denver all her life, was a high school graduate and had won, but not used, a college scholarship. Her father and mother were separated and defendant had maintained an apartment separate from her mother until about ten months prior to the crime charged.

On the morning of April 1, 1943, the husband and wife who managed the apartment house where defendant lived, started in search of the cause of a stench in the laundry room which had been noticed for some time. This led them to the locker room assigned to defendant's apartment. Having no key to the padlock, they unscrewed the hinges and so gaining entrance pulled away the piles of boxes with which the locker was filled and behind and under them found a wooden chest from which the odor seemed to come. This chest was covered with a sheet and tied with a·rope "somewhat as you rope a trunk."

They carried the chest out of the locker to the laundry room where they opened it and found lying on a quilt a cardboard box fastened with strips of scotch tape. Inside the box, wrapped in cloth, was the partially decomposed body of a baby. They carried this body out of doors because of the stench, picked up the quilt underneath which they found wrapped in brown paper another package containing the body of a second baby, and beneath the quilt upon which it lay they found similarly wrapped the body of a third baby. The second and third bodies were dry and mummified.

This discovery was at once reported to the owner of

the apartment house and to the coroner, and defendant was telephoned at the department store where she worked and asked to come home immediately as they had found something in the locker that they thought she should explain.

Defendant came promptly to the apartment house. The owner said to her, "I suppose you know what we found," and she replied, "I have nothing to say." The coroner and his deputy then questioned defendant, and she said the box was hers and that they were her babies; that they were born alive and that she put them in the box. Then an officer arrived and she told him, in the presence of the coroner, that they were born alive—one in 1941, one in 1942, and one in 1943—and that she drowned them in the bathtub and that no one assisted her. In the afternoon defendant was questioned by the police officers and answered more in detail regarding the dates and places of birth of the three children, the circumstances of their birth, their paternity and the details as to her drowning the babies and disposing of the bodies. A stenographer made a record of the questions asked by the captain of detectives and the answers of defendant, which together constitute a full and detailed confession of the births and the drowning of the three children.

At the trial, in addition to the evidence just summarized, there was conflicting testimony of alienists and testimony of two women with whom defendant had been intimately associated in her employment, as well as that of her mother, that she had not been pregnant. Defendant herself did not testify.

Defendant urges error in her conviction, based upon six assignments which we shall consider in inverse order of their presentation in her brief:

1. Subsequent to the trial of the case and after the employment of present counsel for defendant and after two terms of court had elapsed from the date of sentence, a motion was filed in arrest of judgment and

a supplemental motion for new trial upon the ground of alleged failure to protect the rights of defendant under paragraphs 17 and 18 of article II of the Constitution of the State of Colorado. After argument this motion was stricken by the trial court upon motion of the district attorney and such action is assigned as error. No authority is cited or argument made in support of this assignment, and from a careful study of the record we find no violation of constitutional rights.

2. Error is alleged for that the court refused a requested instruction defining voluntary and involuntary manslaughter. Our statute defines manslaughter as, "The unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever." '35 C.S.A., c. 48, §33. Under the facts of this case there can be no basis for any instruction concerning manslaughter. Defendant was charged with the killing of the third baby, which was born on February 11, 1943. Her confession and the undisputed fact that at the time of its birth she had in her possession, hidden in the chest, the bodies of the two babies already disposed of leave no room for any possible interpretation of guilt, except as based upon deliberation. Counsel cite no authority and, as we have held since *Smith v. People*, 1 Colo. 121, in such case an instruction on manslaughter is not necessary.

3. Error is alleged on the giving of the instruction to the jury wherein the court referred to insanity as a disease or impairment of the mind, but did not define it as including a defect of mentality, as was set out in the definition of insanity given to the jury in *Arridy v. People*, 103 Colo. 29, 82 P. (2d) 757. In the Arridy case, the major question for decision by the jury was the sufficiency of the mental capacity of the defendant to form a criminal intent. Here no such issue is involved. Defendant's mental capacity appears to be far above average; she won honors in high school and was so capable in her work as to become manager

of the girls' department at a large Denver store. The instruction as given by the court was a stock instruction on insanity which we have approved several times; no objection to it was made in the court below and no request made for a different instruction. No error was committed in giving this instruction.

 4. Error is urged in the admission of evidence of other offenses. Our attention is particularly called to four objections or motions with regard to such testimony made in behalf of defendant during the trial. The first of these was a motion to strike from the evidence of the assistant deputy coroner testimony relative to any child other than the one named in the information. There had been repeated evidence as to the finding of the three bodies by other witnesses without objection and this evidence was so intermingled that it was impossible to prove the case relied upon without also bringing out the facts as to the finding of the other bodies. This motion was properly denied. The second was an objection to testimony of the city pathologist following his answer that he had occasion to examine babies' bodies brought to the morgue; that "two he just looked at externally; a third he made an autopsy on." Then the question was asked, "Describe the condition of that body," and this was objected to by defendant's counsel. There was no merit to that objection. The third was an objection to the admission of defendant's written confession, and the fourth was a motion that the confession be withdrawn and the jury instructed to disregard it, both on the ground that the confession involved three separate alleged crimes. These were without merit, under the rule that "where the confession contains a mention of another crime committed by the accused," his "allusion to it in his confession may and must be listened to if it is a part of the one entire statement confessing the crime charged at bar." Wigmore on Evidence (3d ed.), vol. VII, p. 497, § 2100 (e).

Going beyond the specific objections made by counsel, from a careful study of all the record the only evidence to which counsel can refer as involving other crimes is that concerning the finding and condition of the bodies of the two babies other than the one upon which the prosecution was based. No attempt was made to charge or prove any criminal intent of defendant in connection with the two older bodies. In addition to the fact that this evidence was so intermingled that it was impossible to make proof regarding the finding of the one body without showing the finding of the other two, the evidence concerning the two earlier babies was admissible otherwise in proof of deliberation in the crime charged, rather than the frantic hysteria of tragedy and inexperience, and also in proof of a preconceived plan of disposing of defendant's offspring in case of pregnancy resulting from her amours. Further, it strengthens the presumption and proof of life, and the possession of the three bodies strengthens the identity of defendant in whose possession they were found as the perpetrator of the crime.

So in *State v. King,* 111 Kan. 140, 206 Pac. 883, a prosecution for murder of a victim whose skeleton was found buried in defendant's barnlot, evidence was held properly admitted of the finding on defendant's premises of the skeleton of another man who had disappeared three years earlier and of a third who had disappeared four years later and of his taking possession of the personal effects of all three victims. Many cases are reviewed in the opinion.

The record shows that defendant's trial counsel interrogated witnesses with reference to the other babies and defendant's present counsel in their argument even urge that the evidence concerning the other babies might have justified the jury in finding insanity—thus themselves admitting its relevancy for that purpose. There was no error in its admission.

5. Error is urged in that the court waited until

its general charge to instruct as to the application of evidence of the finding of the other bodies to the purpose for which it was admitted, instead of so instructing immediately upon its admission.

In its general charge the court properly instructed the jury as to the limited purpose in which this evidence was received. No motion was made by defendant from time to time as the evidence was received that the court instruct on the application of such evidence to the purpose for which it was admitted. Generally it is advisable upon tender of such instruction by defendant to give it at the time; however, there must be some presumption of intelligence of the jury and the proper instruction given at the end of the case rather than at the time the evidence is received is not prejudicial error. *Warford v. People,* 43 Colo. 107, 96 Pac. 556; *Troutman v. United States* (C.C.A. Colo.), 100 F. (2d) 628; *Bold v. United States* (C.C.A.), 265 Fed. 581.

6. Most seriously urged, both at the trial and now, is the contention that there was not sufficient proof of one of the essentials of the corpus delicti, to wit: that the child came to its death by other than natural causes, or that it ever lived. Proof of the corpus delicti may be by circumstantial evidence. Where defendant has confessed commission of the crime, the confession may be considered in connection with other evidence to establish the corpus delicti and it is sufficient if it is corroborated by other evidence. *State v. DeHart,* 242 Wis. 562, 8 N.W. (2d) 360; *Phillips v. State* (Miss.), 16 So. (2d) 630.

"While a voluntary confession is insufficient, standing alone, to prove that a crime has been committed, it is, nevertheless, competent evidence of that fact, and may, with slight corroborative circumstances, establish the corpus delicti as well as the defendant's guilty participation." *Sullivan v. State,* 58 Nebr. 796, 79 N.W. 721.

"The rule requiring corroboration of a confes-

sion is met if the additional evidence is sufficient to convince the jury that the crime charged is real and not imaginary." *Bunch v. People,* 87 Colo. 84, 285 Pac. 766. See, also, *Short v. People,* 27 Colo. 175, 60 Pac. 350; 7 Wigmore on Evidence (3d ed.) §§2070, 2071.

In many cases where confessions are relied on, they are merely oral and dependent on the uncertain accuracy of those to whom they were made. Here, the confession was made orally and subsequently repeated before a stenographer where the questions and defendant's answers were taken in shorthand, transcribed, and each page signed by defendant. Then the next morning at her request she corrected an error as to the time of birth of the first child and initialed the correction.

To convince the jury that the crime which she confessed was "real and not imaginary," we have the actual body of the child; the undisputed testimony that it was fully developed; the fact that it was carefully concealed in defendant's locker; that she had in her possession the key to the locker; that the mummified bodies of the two other babies corroborated her statement as to them; that the scissors with which she clipped the umbilical cord were found at the place she designated in her confession; that the condition of the body corroborated the statement as to the time of its birth and murder, and the striking corroboration of her statement in the confession that she stayed in bed following the birth of this child on the eleventh of February, 1943 and that she had a cold at the time, by the evidence of her friend who had been invited over to a dinner party on that day, that she found the defendant in bed, that she did not come to the table, that they visited at her bedside, and that she had a cold.

Defendant had opportunity to explain under oath the many incriminating facts and circumstances presented by the state. She did not have to explain. She elected to remain silent, and while the fact that she did not testify could not be considered by the jury or

used against her, when she declined the opportunity to explain, she may not complain because the jury drew legitimate inferences of her guilt justified by the evidence. *Blanda v. People,* 67 Colo. 541, 189 Pac. 249.

The corroborating proof, together with the confession, warranted the jury in finding the accused guilty beyond a reasonable doubt.

The order of proof in the admission of a confession is discretionary with the court. *Short v. People, supra; Lowe v. People,* 76 Colo. 603, 234 Pac. 169; *Commonwealth v. Lettrich,* 346 Pa. 497, 31 A. (2d) 155; *State v. James,* 96 N.J.L. 132, 114 Atl. 553, 16 A.L.R. 1141.

A careful and repeated reading and consideration of all the record in this case convinces us that no substantial error was committed; that defendant had a fair trial, and that the evidence was ample to justify the verdict. Accordingly, the judgment is affirmed.

Mr. Justice Knous, Mr. Justice Hilliard and Mr. Justice Alter dissent.

Mr. Justice Hilliard dissenting.

The bases of my dissent go to procedural matters, and will be identified and discussed. Procedure, as it is profitable to observe, is broad in its significance, and contemplates pleading, practice and evidence. In criminal prosecutions, procedure is of first consideration. Upon the rules thereof, whether of common-law development or of legislative enactment, or however emanating, all born of the spirit to proceed humanely in the administration of criminal justice, rests much of human progress. The rules, their background, their office in man's scheme of justice, their inspirational force, their all but divine conception, appeal to all well-meaning men, and in trials of persons charged with punishable offenses, their observance should be the primal concern of those, who, briefly, and in turn, are set apart to judge of the deeds of their fellows. Thus,

and only so, may the history of liberty be kept vibrant, and evenhanded justice made certain and secure. Bishop on Criminal procedure, first few pages any edition; *Kring v. Missouri,* 107 U.S. 221, 2 Sup. Ct. 443, 27 L. Ed. 506; *McNabb v. United States,* 318 U.S. 332, 63 Sup. Ct. 608, 87 L. Ed. 819. Pleading is not involved in this inquiry, but the other major elements of procedure, namely, practice, which has to do with the course of a court in relation to parties before it, and evidence, admitted or rejected, and the weight or value of that received at trials, involving definite issues always present, were determined below in this matter, and the rulings are appropriately challenged by plaintiff in error.

The Corpus Delicti. As the court opinion states, this point was the one "most seriously urged." In relation thereto, the Attorney General properly observes, that, "The questions for legal discussion, * * *, are, did the child live; did it come to its death because of an act of the defendant; and, if so, was the homicide justifiable or excusable." Of the three questions thus stated, the third one, as the Attorney General further suggests, necessarily was not involved. It is quite as true, that, unless the first question posed, did the child live, were affirmatively resolved, the second question becomes as the third one, not involved.

What of the Attorney General's question, "Did the child live?" Or, emphasized somewhat, Did it *ever* live? When the subject of an alleged homicide is of adult development, or of any degree of development unmistakably showing an independent existence in a state of life, then properly it may be assumed that the victim once lived. If the dead body of such a one were found under unusual circumstances, public authorities would be moved to make inquiry, and rightly would proceed on the premise that the body once was the temple of a living soul. Here, however, not a witness testified, nor were there any circumstances to indicate, that the body which was found was of one who, independent of its

mother, had lived, or that it was born alive. The circumstances did warrant an investigation, which was made, and in the course thereof physicians performed an autopsy on the body. They testified that the child was of "full term," but neither they nor any other witness testified that the child was born alive or had ever lived, or, that, having lived, it was killed or did not die a natural death. Neither the physicians, nor others, professional or lay, were asked to express expert opinion as to whether the child was born alive, or came to its death through any criminal means or agecny, nor did any of them volunteer testimony in that regard. There was no testimony that the autopsy revealed, nor was there testimony otherwise of the existence of, wounds or bruises of any nature in or upon the body, or of the presence of poison or of conditions indicating drowning, or that the child had suffered violence in any manner or degree whatever. The sum of the testimony of all the witnesses, was, that the body of a child not living, nor shown to have lived, had been discovered, upon which an autopsy, revealing nothing incriminating, had been performed. The Attorney General, answering his own question, "Did the child live?" says: "From the testimony of the doctors, there can be no question but that they were of the opinion that the child was a 'full term' baby and a normal child. This being true," the Attorney General continues, "it * * * follows, in the absence of any suggestion to the contrary, that the child was born alive." In like tenor, the court opinion recites, that, "we have the actual body of the child; the undisputed testimony that it was fully developed." Thus, the Attorney General predicates his argument, and the court determines, there was evidence that the child was born alive, and came to its death through a criminal means or agency.

As to the elements of corpus delicti in a homicidal case where the victim is an adult, or of physical development necessarily importing enjoyment of indepen-

dent life, clarity attends in Colorado. In *Lowe v. People,* 76 Colo. 603, 234 Pac. 169, Mr. Justice Burke, speaking to the subject in an opinion to which all the judges gave adherence, said: "Proof that one charged committed a felonious homicide involves three elements; first, the death; second, the criminal agency of another as the cause; third, the identity of the accused as that other. The first two constitute what is known in law as the corpus delicti. Some authorities erroneously include the third but this makes the corpus delicti identical with the whole case of the people." See, also, *Asmus and Moon v. People,* 47 Colo. 167, 107 Pac. 204; *McBride v. People,* 5 Colo. App. 91, 37 Pac. 953; *Herren v. People,* 28 Colo. 23, 62 Pac. 833. "Death," the first element stated by Justice Burke in the Lowe case, is defined as "The cessation of life. The ceasing to exist." 1 Bouvier's Law Dictionary, Rawle's Third Revision. For the purposes of judicial inquiry, "Death," or "Cessation of life," or "ceasing to exist," necessarily must be of and concerning a human being who once *lived* or *existed.* In the ordinary case, there is evidence of the existence of a dead body, and that the age or physical development thereof otherwise, was such that it must have enjoyed independent existence in life. On such showing, the element "death" properly would be deduced. But this is not the usual case. Here, the body, while of a human creature, was not shown to have reached development assuredly importing existence of independent life. There was evidence, as already seen, that its dependent life had continued for the usual "full term," and that if all had gone well its little body might have been ushered into the world and become alive; but that it did live is not supported by any evidence. For understandable consideration, the authorities refer to cases of the nature of this prosecution as "infanticide," and in relation thereto, the procedural requirement is that the prosecution must show that the child was born alive.

Before proceeding to the discussion of proof require-

ments in infanticide prosecutions, I pause to refer again to the Attorney General's assertion, a portion of which I italicize, that since the "child was a 'full term' baby and a normal child, * * * it follows, *in the absence of any suggestion to the contrary,* that the child was born alive." The implication of the Attorney General's statement is that it was incumbent upon the defendant to show that the child was not born alive. The contrary is the rule. The late Chief Justice Campbell gave utterance to a familiar rule, when, writing to reverse a judgment, he said: "It is not incumbent upon the defendant in a criminal case, either by his own evidence or that of the people, or both combined, to prove anything." *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018. That language was quoted with approval in *McRae v. People,* 101 Colo. 155, 71 P. (2d) 1042, and approvingly cited in *Frank v. United States,* 42 F. (2d) 632.

To establish the corpus delicti "in infanticide it must be shown that the child was born alive." Wharton on Homicide (3d ed.), p. 897, §587. "It must be proved that the child was born alive, and that death was caused by a criminal agency." 41 C.J.S., p. 22, §312f. "It is of course as necessary to establish the corpus delicti in infanticide as in other homicide cases." 30 C.J., p. 290, §534. "Death is the opposite of life; it is the termination of life, and death cannot be caused when there is no life. There must be a living child before its death can be produced." *Evans v. People,* 49 N.Y. 86. A conviction of manslaughter was reversed by the Supreme Court of Iowa because the court refused to instruct the jury that the state must prove beyond a reasonable doubt that the child, whose death the defendant was charged with having procured, respired and had independent circulation previous to its death. *State v. Winthrop,* 43 Iowa, 519, 22 Am. Rep. 257. "We forbear a further discussion of the evidence, since the case must be reversed on account of the failure of the State to show that a murder was committed. In other words,

there is no satisfactory proof that this baby was born alive." *Morgan v. State,* 148 Tenn. 417, 256 S.W. 433. "The rule, as we understand it, in every case, before a party can be convicted of criminal homicide, requires that the corpus delicti be proved; and this means not only that the dead body of the deceased person shall be found and identified, but that it must also be shown that it came to its death by some criminal means or agency on the part of the accused; and, in the case of infanticide, it must also be established that the child was born alive." *Josef v. State,* 34 Tex. Crim. 446, 30 S.W. 1067. That case was cited and approved in *State v. Merrill,* 72 W. Va. 500, 78 S.E. 699, where there was an exhaustive review of the authorities on the point. In *Shedd v. State,* 178 Ga. 653, 173 S.E. 847, the cases were examined at length, and from many of them there were pertinent quotations. All were to the effect that in infanticide cases, the prosecution is required to establish beyond a reasonable doubt that the child was born alive. Addressing itself to the case then claiming attention, the Georgia Supreme Court said: "Eight or nine days after the infant had been buried a physician performed an autopsy. The body was badly decomposed. One lung was removed and given the hydrostatic test and otherwise examined. The doctor testified in part: 'My opinion as a physician and surgeon, from my observation and experience and medical science, is that the child breathed after it came into the world.' This was not an unqualified statement of opinion," continued the Georgia Court, "that the child was born alive, or that it had acquired 'independent circulation and existence' separate from its mother. The testimony of the physician as a whole was consistent with the theory that the child was born dead, and there was no other evidence tending to show that it was born alive. The evidence being of this character was insufficient to establish the corpus delicti beyond a reasonable doubt, and the court erred in refusing a new trial." In the present case, as already

I have shown, there was not even conjecture from any witness that the child was born alive. The issue involved in the case of *Sheppard v. State,* 17 Tex. Ct. of App. 74, is much like that in the present inquiry, and is widely cited throughout the country. "The only question for us to determine," said the court there, "is as to the sufficiency of the evidence to sustain the verdict and judgment. Let us concede that it is sufficiently established that appellant gave birth to the child which was found dead in the box which was discovered buried in the ravine. Does the evidence sufficiently show that the child had been born alive and that it was killed after its birth?

"Dr. Shaw, who saw the child, says the child was well developed and apparently full grown. He examined it carefully and saw no marks of violence upon its body. He opened the body and its heart and lungs had a healthy appearance. A diaper or napkin was found upon the child, which was stained as though it had had an evacuation, and this, in his opinion, was a strong indication that the child was born alive. He did not apply the hydrostatic test to the lungs—the best test known to medical science for determining whether or not the lungs have ever been inflated by air. His opinion, from his examination of the body and hearing the testimony of the other witnesses, was that the child had been born alive, and had an independent existence, separate from its mother. In addition to other facts, he stated that the umbilical cord had been tied.

"Dr. Nettles, who heard Dr. Shaw's testimony, and having had the testimony of the other witnesses stated to him, said that from this testimony 'I could not say that it (the child) had a separate existence from that of its mother. The best test known to medical science to determine whether the child breathed or not after birth, is the hydrostatic test. A full grown child, with full head of hair and well turned and rounded nails,

might come still-born, and its skin might have a healthy appearance.'

"To say the least of it," the court continued, "the evidence that the child was born alive is susceptible of doubt. But concede this fact. Did its mother murder it? No violence is seen on the body of the child. The most inculpatory facts are that she concealed its birth, that it was found buried in an out of the way ravine, and that she left that section of the country, and perhaps denied her name when the officer went to arrest her. These, doubtless, are suspicious facts, but in the absence of any evidence of violence upon the dead body, we do not think they are in themselves sufficient to establish the fact that she murdered her child." The judgment was reversed and the cause remanded. *Harris v. State*, 28 Tex. Ct. of App. 308, 19 Am. St. Rep. 837, 12 S.W. 1102, is directly in point, but since it also covers another angle of the case, I will quote from it, and other authorities, later. In *Commonwealth v. O'Donohue*, 8 Philadelphia Reports, 623, the court said, "it was necessary for the commonwealth to prove affirmatively not only that the child had breathed, because that might occur during birth, but that it had had a complete and separate existence of its own after birth." In *State v. O'Neall*, 79 S.C. 571, 60 S.E. 1121, the mother was charged with manslaughter, in that she caused "the death of her infant child, whose body was recovered from a well on the premises where she was living." There, as here, the prosecution having failed to prove that the child was born alive, the court was moved to say: "It hardly seems worth while to pursue with great care and particularity circumstances of suspicion; there was no testimony that the child had ever breathed or was alive at the time of its birth. The surgeon who made the post-mortem examination was careful to state that he could not tell that the child had ever been alive. No other witnesses testified as to the child's condition at birth. The defendant, its mother, when examined as

a witness, was unable to state the child's condition, although she admitted that she was the mother of the child.

"As is decided in the case of *State v. Wimberly,* in 3 McCord, 190, syllabus: 'In indictments for murder and manslaughter it is indispensably necessary to state that the death ensued in consequence of the act of the prisoner.' And as it is stated in 1st Wharton's Criminal Law (8th ed.), p. 336: 'In cases of infanticide it must be shown that the child was born alive, and for this purpose an independent circulation is necessary.' *State v. Winthrop,* 43 Iowa, 519. Again, on page 416 of the same volume, it is said: 'But it must be proven that the child had been born in the world in a living state; the fact that it had breathed for a moment is not conclusive proof thereof.'

"The testimony in the case at bar, and the citation of authorities hereinbefore made, render this Court unwilling to confirm a verdict of guilty of manslaughter by the jury; however painful and distressing child murder is felt to be, yet prudence requires, and humanity also demands, that a conviction of the poor mother is too dreadful to be rested alone upon suspicion." See *Rex v. Kersey,* 21 Cox Cr. Cases 690 (Eng.); *Regina v. Wright,* 9 Car. & P. 754 English Reports (full reprint) 1039; *United States v. Aquine,* 34 Philippine 813.

The foregoing exposition of the procedure obtaining in homicide prosecutions, fairly sets forth the philosophy of courts generally, as expressed by capable, studious, humane, and merciful jurists, proceeding in pertinent inquiries. The rule, which, for immediate consideration, I restate, is that in any homicide case there must be evidence of the death of a human being, and that the death was caused by a criminal agency; and, in an infanticide case, as here, there must be evidence of the necessary preceding fact that the child was born alive. Applied in this inquiry, the prosecution, preferably, but not necessarily, proceeding in sequence, carried the bur-

den of establishing that the victim had lived, that it had succumbed to death, and that its death was caused by a criminal agency. If the evidence failed in any one of the three particulars mentioned, and, as my study convinces, it failed in toto, the corpus delicti was not established. I reemphasize that there was no evidence, direct, circumstantial, or opinion, that the child was born alive; hence, no proof that it ever lived, and that should have worked the end of the prosecution; and, since life in the child never obtained, it follows that proof of its "death" was not possible. Thus, that step of the proof of the corpus delicti, never logically reached for consideration, failed. There was not the slightest evidence, that, assuming the child lived, it came to its death through any criminal agency or that its death was not due to natural causes. The victims in all cases cited in the court opinion were adults, who, obviously, were born alive, and in relation to whom, in every instance, there was independent substantial evidence that death was due to a criminal agency. Thus buttressed, the prosecution in those several cases was permitted to introduce the extrajudicial confession of the accused, the office of which was to establish the identity of the author of the homicide, then, but not previously, pertinent to the inquiry.

Extrajudicial Confessions. Defendant made an extrajudicial confession, which the court opinion says, "may be considered in connection with other evidence to establish the corpus delicti." The first answer is: There was "no other" evidence of the corpus delicti. A second answer is, that corpus delicti "must be proven independently" of the confession. 2 Wharton's Crim. Ev. (11th ed.), p. 1069, §640. "Stated conversely, the rule is that an extrajudicial confession of the accused must be corroborated by independent proof of the corpus delicti of the crime." Ibid., p. 1070. In support of the quoted text, cases are cited from the United States Supreme Court, Federal Circuit Courts, and the courts of last resort of some thirty states, including Colorado.

The cases cited from Colorado, are *Roberts v. People,* 11 Colo. 213, 17 Pac. 637, and *Bunch v. People,* 87 Colo. 84, 285 Pac. 766. Other Colorado cases in point are *Short v. People,* 27 Colo. 175, 60 Pac. 350, and *Dougherty v. People,* 1 Colo. 514. "The general rule," as we said in the Roberts case, "is that extrajudicial confessions of a prisoner are not sufficient to warrant a conviction without proof *aliunde* of the *corpus delicti;* or, as it is sometimes stated, the prisoner's confession of the crime must be corroborated by other and independent evidence." Giving attention to the "other and independent evidence" in that case, we said: "We are of the opinion that there is sufficient evidence to show a larceny of ores from the Forest City mine. Whether the larceny was committed by the prisoner is an entirely distinct question for independent consideration." In the Short case, we said the court "submitted the case to the jury on the assumption that there was independent proof of the *corpus delicti.*" In the Dougherty case, the defendant's extrajudicial confession was admitted. Counsel there contended that otherwise the corpus delicti had not been established, hence not established at all. We examined the testimony of the several witnesses there, and, the assertions of counsel notwithstanding, determined that, apart from the confession, "the *corpus delicti* is sufficiently shown by the evidence," as study of the case fully reveals. Concerning the situation there, however, we discoursed as follows: "It is said, by the counsel for the prisoner, and very justly, too, that confessions made by a prisoner, unsupported by corroborating circumstances, are not, of themselves, sufficient to prove the *corpus delicti.* There should always be something more than a mere naked confession of one accused, to justify a verdict of guilty. The sad examples furnished in judicial annals, should make courts and juries extremely cautious about basing convictions on foundations of this kind alone." The expressions in this early case, coupled with what we have said in subsequent

cases, as I have set forth, fully warrant text writers in asserting that Colorado is committed to the rule which I have quoted from them early in this paragraph. In exhaustive opinions, two of the justices lending their talents to a statement of the rule, the Michigan Supreme Court considered a case of infanticide, and held that the accused's extrajudicial confession could not be employed in support of the corpus delicti. Mr. Chief Justice Wiest, in a concurring opinion quoted Cooley's Constitutional Limitations as follows: "A confession alone ought not to be sufficient evidence of the *corpus delicti*. There should be other proof that a crime has actually been committed; and the confession should only be allowed for the purpose of connecting the defendant with the offense." Continuing, he said: "In the case at bar it was necessary for the prosecution, *aliunde* the confession, to establish the death of the infant by criminal means. If so established, then defendant's confession that she committed the offense was competent, otherwise not. If it be conceded that the child is dead, such fact establishes no crime, for we still have the question of whether such death was occasioned by criminal means. Without defendant's confession there is not a word of proof, direct, circumstantial or presumptive upon this essential element of homicide. * * * The *corpus delicti*, or criminal fact, is a thing apart from finding the criminal. Is defendant's confession plenary evidence upon the cause of the death of the infant? No. In case the death of the infant is shown to have been by criminal means then, and not until then, may her confession be taken that she is the criminal." *People v. Kirby*, 223 Mich. 440, 194 N.W. 142. In *Harris v. State*, 28 Tex. Ct. of App. 308, 12 S.W. 1102, 19 Am. St. Rep. 837, which was an infanticide case, the court, after announcing the rule that "To warrant a conviction it was necessary for the state to prove that the child was born alive; that it had an existence independent of the mother, and that afterwards its life was destroyed by the act, agency, or

procurement of its mother, this defendant," recited that the mother had "confessed that the child was born on Sunday night; that it was born alive; that she had put it into Dr. Baldwin's spring, and that it was alive when she put it in the spring. The child was found the following Wednesday. * * * The doctor who testified as an expert says: 'I can not say positively whether the child was ever alive, or whether it ever breathed.' He dissected the child's head, and found that the skull had not been fractured. He took out the lung and applied the hydrostatic test and found air in it, the usually accepted test that it had breathed. * * * Concede that the child had been born alive. Was it killed, or was it drowned? Evidently the doctor does not think it was killed by violence. As to the chances and probabilities that it had been drowned, he does not say one word. * * * What evidence of drowning is there outside the confession?" Of course, as the court indicated, there was none. The record considered, the court determined that the "evidence is insufficient to establish the *corpus delicti.*" In a recent infanticide case, *State v. Johnson,* 95 Utah 572, 83 P. (2d) 1010, the court, proceeding in a scholarly opinion, and exhaustively, said "There must be independent proof of the corpus delicti before the confession can be received for the consideration of the jury, and that corpus delicti, as so used in a homicide case, involves two elements: The fact of the death, and the fact that it was brought about or induced by a criminal agency." Clearly, in the present prosecution, there was lack of "foundation upon which to build the evidential structure showing who was the perpetrator." A crime was charged, but it was not established. Hence, the factual situation considered, and the rule respected, defendant's extrajudicial confession was void of pertinence.

.Other Offenses. I will not give this point extended consideration, but my conviction is, that the prosecution was permitted to "run wild" in its introduction of evidence of other offenses. It is true that in its charge to

the jury at the submission of the case, the court stated the limit which should attend such evidence, but by that time, and particularly in this case, the damage had been done. In any case, and the rule was imperative in the situation here, the court should explain the limitation at the time it receives such evidence. *Myers v. People,* 65 Colo. 450, 177 Pac. 145; *Dockerty v. People,* 74 Colo. 113, 219 Pac. 220; *Warford v. People,* 43 Colo. 107, 96 Pac. 556. Indeed, the district attorney should be required to explain the purpose and limitation at the time he makes the offer, and the court should accentuate it as the evidence is admitted. "It is by far a better and safer practice in any case where evidence is admissible for a certain purpose * * *, that the court, at the time the evidence is received, instruct and admonish the jury of the purpose for which the evidence is received * * *. If that be not done the jurors will be very apt to consider the evidence for every purpose, and the matter will be thus fixed in their minds which will not easily be eliminated by an instruction given at the conclusion of the trial. * * *. An instruction may thus fail to produce the desired effect." *State v. McCurtain,* 52 Utah 63, 172 Pac. 481. See *People v. Carmichael,* 314 Ill. 460, 145 N.E. 673. It has been held that the testimony should be limited, both at the time of admission and in the general charge. *Minner v. United States,* 57 F. (2d) 506. "Where evidence is admissible only for a limited purpose, * * *, the court may properly admit the evidence for such limited purpose only. It should thereupon admonish the jury to use such evidence only for such limited purpose, and not as evidence as to the merits of the case for either the prosecution, or for the defense. Failure to so limit the purpose of such testimony is prejudicial error." Abbott Crim. Trial Practice (4th ed.), p. 651, §357. In the case before us, in addition to what occurred in the trial court in relation to this point, I respectfully suggest that the court opinion is replete with references to defendant's plural "amours."

In short, as it appears to me, defendant, charged with one offense, was tried for three, and the plurality of consideration was not wholly absent on review.

Instruction on Insanity. On this point, I only pause to say, that I think the record called for a broader definition of insanity than was comprehended in the one given.

Requested Instructions on Manslaughter. I think the circumstances of this case fairly required an instruction upon which, the jury being moved thereto by what properly they might conclude from the record, could have returned a verdict of manslaughter.

Finally, considering that in the genesis of the offense charged, the unhappy young woman involved, who no doubt was weak and thoughtless, but who, nevertheless, and necessarily, was "aided and abetted" by a bold, unscrupulous and irresponsible male biped; that she was tried in a court over which a man presided; that her prosecutor was a man; that twelve men determined her fate at trial, and that on review only men are participating, I am impelled to give pause. I confess that the urge to make contribution to the clatter of stones being cast is not a little moving, but recalling a celebrated challenge that caused a multitude of men, proceeding "one by one," to desist therein, I am constrained to withhold the rock which I hold in my hand.

MR. JUSTICE KNOUS and MR. JUSTICE ALTER concur in this opinion.